## PERMUTIT CO. v. GRAVER CORPORATION.

District Court, N. D. Illinois, E. D. January 18, 1930.

No. 7909.

Drury W. Cooper, of New York City, George A. Chritton, of Chicago, Ill., and Mitford C. Massie and Allan C. Bakewell, both of New York City, for plaintiff.

Charles L. Byron and George L. Wilkinson, both of Chicago, Ill., for defendant.

LINDLEY, District Judge. █ Plaintiff seeks to enjoin defendant from manufacturing water softeners said to infringe claims 1 and 5 of patent to Robert Gans of Berlin, Germany (J. D. Riedel Aktiengelsellschaft, of Berlin, Germany, assignee) applied for August 5, 1911, issued August 22, 1916, No. 1,195,923, as follows:

Claim 1. "A water softening apparatus comprising a casing, a filter bed consisting of a layer of sand or quartz and a layer of zeolites or hydrated alumino-silicates disposed on the layer of sand or quartz, means for permitting the passage of water through the casing, means for cutting off supply of water on the exhaustion of zeolites, and means for

passing through the casing a solution of a salt capable of regenerating the zeolites."

Claim 5. "Water softening apparatus comprising a casing, a filter bed consisting of a layer of zeolites or alumino-silicates, supporting means for said layer, means for permitting the passage of water through the casing, means for cutting off the supply of water on the exhaustion of the zeolites, means for supplying and passing into the casing a solution of a salt capable of regenerating zeolites and means connected to the lowest point of the casing for removing the salt solution so introduced."

Defendant asserts as defense invalidity and noninfringement.

As originally granted, the only substantial difference between the two claims was the addition to claim 5 of the last element, viz., "means connected to the lowest point of the casing for removing the salt solution so introduced."

Pending a similar suit in Detroit, plaintiff, on March 2, 1920, disclaimed from the scope of claim 1 any such apparatus as is therein described in which the water to be softened passes upwardly through the zeolites, thereby limiting claim 1 to the downflow type. Claim 5 is not so expressly limited, and, despite defendant's contention that said disclaimer should effectually likewise limit it, other courts have refused so to hold. Permutit Co. v. Harvey Co. et al. (C. C. A.) 279 F. 713, and Permutit Co. v. Wadham et al. (C. C. A.) 13 F.(2d) 454.

The subject-matter is an apparatus for softening water by means of zeolites, which are chemical compounds existing in nature, but likewise produced chemically, and so produced patented by Gans in patent No. 960,-887. They possess the unique and valuable property of being able, when saturated with a solution of sodium chloride, to take up from water passed through them such hardening elements as calcium or magnesium, and, when once thoroughly charged with the latter, to exchange the same for salt when brought in contact therewith. The nature and properties of zeolites are alluring, but they are the subject-matter, not of this, but of prior patents.

The claims here under consideration do not cover the idea of softening water by means of zeolites, the regeneration of said zeolites, or the rinsing thereof by backwashing. They cover only a filtering device for making use of zeolites in such manner as to utilize their known functions in softening water.

The essential elements of water softening are the passage of water through zeolites, the regeneration of such zeolites when exhausted by recharging them with a sodium chloride solution and the rinsing thereof, so that no noticeable tinge of salt remains in the water when reduced to practical use.

When Gans made his application in 1911, all claims were rejected on three Bommarius patents, Nos. 519,565, 632,091, and 707,899 as merely involving the substitution, for the filtering material of Bommarius, of the material disclosed in Gans patent, No. 960,887, where Gans had explained the properties of zeolites, and demonstrated that water may be softened thereby and the exhausted silicates regenerated by a solution of common salt. Gans next urged that a chemical action took place in his process, as contrasted with the mechanical processes of Bommarius. Again the claims were rejected as reciting nothing more than the substitution of a water treating means disclosed in patent applications of record for the water treating means disclosed by the three references. On August 26, 1914, Gans canceled certain claims and asked that claims 4 to 7 stand. Said claim 4 is now claim 1 of the patent, with the limitation "of a layer of sand or quartz."

Claim 5 in its present form was introduced into the application on March 26, 1915. It was rejected as disclosing nothing more than a double use of the apparatus disclosed by each of the patents to Bommarius. On June 30, 1915, Gans amended, and again the claim was rejected. On April 21, 1916, another amendment was made, and on May 6, 1916, claim 5 was finally rejected. Then on June 16, 1916, claim 5 was amended by adding these words: "And means connected to the lowest point of the casing for removing the salt solution so introduced." The Patent Office found no basis for patentability until this last mentioned element was added.

The Patent Office did not mention any of the references hereinafter discussed, all of which are German in their origin. In view of their direct relevancy and pertinency to the questions then before the Commissioner, the only fair inference is that the office had no knowledge thereof.

In addition to the Bommarius patents mentioned by the Patent Office, covering three forms of apparatus for water filters, consisting of a casing with layers of filtering materials through which the water was passed, as indicative of the state of the art, defendant has submitted to the court the Feldhoff article of September 7, 1907; the Technische Rundschau article of January 27, 1909; the

Gans article of April 15, 1909, all German publications; the German Leister patent, No. 211,064; German Gebrauchsmuster, No. 341,512; German Gebrauchsmuster, No. 313,671, and certain other patents and a thesis published in German, known as the "Weiss Thesis."

The expressed elements of claim 1 are an apparatus comprising: (1) A container (casing); (2) a filter bed of sand; (3) a layer of zeolites on the sand; (4) means for permitting the passage of water through the container; (5) means for cutting off the water; (6) means for passing through the casing a solution of salt to regenerate the zeolites. The elements of claim 5 are the same, with the addition of the means for removal of the salt solution to be connected with the lowest point of the container.

Under the Bommarius patents a container with a filter bed of sand and means for permitting the passage of water therethrough were old. Nor was there anything new in the substitution of zeolites for the filtering material of Bommarius.

The claim of invention finds basis eventually in the asserted inclusion in each of the claims of an element, not expressed therein, but claimed by plaintiff, and recognized in the cases cited, to be necessarily implied, viz., a requirement that the bed of zeolites mentioned shall be open, i. e., that there shall be an open space between the top of the zeolites and anything above them, thus furnishing opportunity to the silicates to spread out when flooded, and the inclusion in claim 5 of the element that the means for draining the salt solution from the casing shall be connected thereto at the lowest point. If the claims do not necessarily imply a free or open bed of zeolites as contrasted with "a locked bed," or if the inclusion of such implied element in the combination did not bring about invention claim 1 fails, and, if in addition the element of attachment of the drain for salt water at the lowest point was not invention, claim 5 fails.

The Gans article was published on April 15, 1909, under the heading "The Technique of Water Purification." He therein stated: "The process is in its most simple form a pure exchange process by which the calcium and magnesium of the water are taken up by the zeolite and the sodium is given off to the water. * * * The regeneration is performed by washing off the zeolites, which have been saturated with calcium or magnesium, with a common salt solution, by which means a sodium zeolite is again produced which is again able to soften new quantities

of water. * * * There are already several filters of this sort in use, some to prepare soft water for boiler feed purposes and other for laundries. The filter plants are remarkable through the simplicity of their arrangement. * * * The softening is complete with cold water. * * * The apparatus consists of an iron or wooden filter. The height of the permutit (zeolite) bed is determined by the hardness of the specific water and the rapidity of filtration. The useful effect is greater the more slowly the water flows through the permutit filter and the finer the grain thereof. The permutit bed lies upon fine sand, which becomes coarser at the bottom." The proper translation of the next sentence is in dispute. Defendant's translators read it as follows: "At the top it is best closed off by a sand filter placed about one-third to one-half meter above the surface of the permutit layer." The remainder of the paragraph is not in dispute, and is as follows: "The sand filter under many conditions can be replaced by a limestone filter, for instance, when treating water containing iron and acids. This arrangement of the upper sand or limestone filter will also prevent that by back-washings, the specifically lighter permutits are not mechanically washed away."

If the defendant's translation be accepted, it would appear that Gans in 1909, more than two years before the filing of his patent, published to the world a description of a water softener containing every claimed essential element of claim 1. Plaintiff insists that the proper translation of the disputed sentence above mentioned is in substance as follows: "At the top it is best finished off by a sand filter which, with a thickness of about one-third to one-half meter is arranged over the surface of a permutit layer," and contends that this language indicates that, when Gans wrote the article in 1909, he was not describing the apparatus which he later patented, but one in which there was not a free space above the body of zeolites.

Appreciating that the proper translation is a question of fact, I am of the opinion, after a careful perusal of all of the direct and cross examination of the translators, that defendant's translation is more nearly consistent with the original meaning of the German words used than that of the plaintiff. The cross-examination of the translators who testified for plaintiff weakens the force of their direct testimony. I am of the opinion that at that time, in 1909, Gans was describing a body of zeolites which was free and unconfined.

In this connection the testimony of the president of the plaintiff brings to light some interesting facts. He was an associate of Gans in Germany, and observed certain apparatus for softening water in which there was directly above the body of zeolites not an entirely open space, but one occupied by excelsior held in contact, according to his testimony, with the zeolites by a floating weight. He testified as to the results of his observation, and said that subsequent to said time Gans showed to him and tested in his presence a different arrangement in which the excelsior was omitted and replaced by a free space above the zeolites; that this excelsior was removed from the second apparatus and the free space substituted therefor in the latter part of 1907 or the early part of 1908; that at that time Gans discarded the excelsior and designed his device with an open space above the zeolites; that about the middle of 1909 the witness built filters according to Gans' later design, and that thereafter he built only devices with free spaces above the zeolites. Thus the plaintiff has furnished testimony to the effect that in the latter part of 1907 or the early part of 1908 Gans became convinced by the demonstrated operation of the device that the excelsior should be removed and a free space substituted therefor, and then eliminated the excelsior and supplanted the same with a free space. With this realization in his mind, the existence of which is proved by plaintiff, it is unreasonable to believe that he would, a year after he made his alleged discovery of the necessity of free space, describe in his published article as a satisfactory filter one which did not have the free space, the alleged deficiency of which plaintiff now proves Gans discovered as early as the latter part of 1907 or the early part of 1908.

Gans, the only witness who could have thrown more light upon this subject, residing in Germany, was not brought to this country as a witness, nor was his deposition taken. There is certainly no presumption that, if produced by the plaintiff, he would have testified to anything in contradiction to his former associate, or that he did not intend to describe an unconfined bed of zeolites in his publication. The conclusion is unavoidable that Gans in April, 1909, intended to describe, and did describe, a filter with the essential elements of his later application and one containing the now alleged implied essential element of a free and unconfined space above the zeolites. He disclosed a water softener apparatus composed of a casing, a filter bed of sand, a layer of zeolites dis-

posed thereon, means for permitting the passage of water through the casing, means of cutting off the supply of water on the exhaustion of zeolites, the suggestion of regeneration to be accomplished by washing off the zeolites with a salt solution and of backwashing for rinsing.

Gans said that the arrangement he suggested would prevent the light zeolites from being washed away by "backwashings." This was information to the public that backwashing for the purpose of washing off the salt solution was essential; that he did not further discuss it undoubtedly was due to the fact that such treatment is obviously necessary in order to rid the zeolites and the filter casing of an excess of salt before the water becomes palatable.

This is of importance. Plaintiff now insists that claim 1 comprises as one essential element a free and unconfined bed of zeolites, and supports the assertion by the testimony of its expert, who, after admitting that in neither the claims nor description of Gans' patent is there any statement about a free and unconfined zeolite bed, said that Gans must have contemplated a free and open bed because in the description he speaks of "backwashing," and that the conclusion that it is essential that the bed of zeolites be free is implied from Gans' use of the word "backwashing," for the reason, as the witness claims, that there cannot be proper backwashing of a locked bed. In his article Gans uses the word backwashing obviously with the same meaning, and, if it is necessarily a conclusion that the word "backwashing" in the patent presupposes a free bed of zeolites, then it is equally true that the use of the word backwashing in the article presupposes the same kind of a bed. Thus, on the theory of plaintiff's expert, it is evident that Gans in 1909 was describing a filter with a free bed of zeolites, thus corroborating the testimony of plaintiff that as early as the latter part of 1907, or the early part of 1908, Gans had realized that excelsior would not do, and was building before 1909 an apparatus which had a free bed.

On September 7, 1907, there was published in a technical journal in German a lecture delivered by one Feldhoff, evidently a pupil of Gans, in which Feldhoff described to engineers the nature and properties of zeolites. He directed attention to everything Gans had then published, advised his hearers of the chemical formulæ, and performed demonstrations of the process before them. He remarked: "It would be 'carrying owls

to Athens' for me to waste many words for this assemblage of recognized skilled engineers upon the value of a rational method of de-liming boiler feed water." He produced a small filter, and said that the water was led into the same from below, passed through a layer of gravel, proceeded upward through the zeolites, and left the filter fully softened, that, when the filter was exhausted, one should pass a solution of sodium chloride through the zeolites, following the same path as the water by turning a two-way valve, and that the excess salt should be removed by washing. He stated that Riedel had erected such a filter which had been commercially successful, and produced a full set of drawings which disclosed a casing containing a filter bed of sand, a layer of zeolites thereon, means for permitting the passage of water through the casing and a valve for cutting off the supply of water, and means for passing through the casing a solution of salt capable of regenerating the zeolites.

This was an upward flow softener, through an unconfined body of zeolites, and, apparently appreciating the significance of the disclosure, plaintiff, after instituting its suit in Detroit in 1920, filed its disclaimer as to claim 1, disclaiming as to upflow softeners. Later the Court of Appeals in Permutit Co. v. Wadham, 13 F.(2d) 454, 457, in holding that claim 1 was valid, said: "Nor does it follow that * ° * there is no patentable distinction between the down flow and the up flow. The former works satisfactorily, and it seems probable, if not certain, that the latter would not. The reasons why one will and the other will not show that this difference is one of those which are not so simple as 'they seem." Obviously the court was of the opinion, drawn from the evidence before it, that the upward flow softener would not work, and that therefore the reference to an upward flow softener was not pertinent. The evidence in the instant case is conclusive to the effect that upward flow softeners are in fact of greater utility and efficiency than downward flow softeners.

Plaintiff's own Duggan patent, No. 1,276,629, originally asserted in the cited case in the District Court as one basis for relief, but afterward withdrawn, is a complete rebuttal of the claimed advantages of the downward flow type softener, for, after discussing the difficulties in a downflow device, the patentee said: "An upward passage of water in the softening phase avoids in large measure these difficulties, giving a greater period of activity since the buoying action of the current keeps the granules apart and

prevents packing and channeling." Duggan pointed out the advantages of his alleged invention, including a locked zeolite bed, where the zeolites are kept in position by a cross plate resting thereon. When plaintiff filed its said suit, relying upon both Duggan and Gans, it was relying under Duggan upon his assertion of the desirability of the upward flow locked bed type softener, and under Gans, as finally interpreted, upon the theory that neither the lock type nor upward flow was feasible. By dismissing as to Duggan, and by disclaiming under claim 1 as to upward flow types, plaintiff was in a position to attack the efficiency of upflow softeners with locked beds, and to insist, therefore, that the Feldhoff article taught Gans nothing in the making of his apparatus.

Gebrauchsmuster No. 313,671 was registered June 27, 1907, according to the German law under the title, which was published to the world: "Filter for Removing the Lime from Boiler Feed Water consisting of a box with permutit (zeolith) filler enclosed between layers of gravel, a regenerating Device." In his application the applicant stated that the subject-matter was a filter for removing lime from boiler feed water; that it consisted in part of a container funnel-shaped at the lower part, and containing a layer of gravel of thirty centimeters thickness, zeolites of 750 liters, and on the top of the latter another layer of gravel of 20 centimeters thickness; that it included means for introducing water into the container, distributing the same by a baffle plate, passing it through the gravel and zeolites, and causing it to emerge free of lime or magnesium. To regenerate, applicant provided a two-way valve, so that a solution of salt could be passed through the filter and out of the same through a discharge pipe. A manhole was provided in order to clean or remove the gravel. Apparently each of the elements named in claim 1 are presented in this description, with the exception of the alleged implied essential that the bed of zeolites shall be unconfined.

Gebrauchsmuster 341,512, May 30, 1908, by Neumann, claimed a soft water filter for domestic purposes, comprising different elements, consisting of a tank in which had been placed zeolites, and a sprinkler entering below the level of the hard water, distributing the water into the filter. The water flowed through the entering pipe, passed through the zeolites, and ran off in a softened state at the bottom. The top of the casing and the bed of zeolites were open, and the zeolites were regenerated by being flushed with a

common salt solution. The drain pipe was at the lowest point of the casing. Backwashing could be accomplished by connecting a water supply to the outlet at the bottom of the tank.

■ It is asserted that these Gebrauchsmuster files are not patents, and therefore not pertinent references. In this country various classes of inventions may be the subject of patent, viz., arts, machines, manufactures, or processes, compositions of matter and designs. We have one class of patent protection for all inventions. Patent protection is an exclusive right given to inventors for limited time in and to their respective disclosures. One Langner testified that as an international patent and trade-mark solicitor he is thoroughly familiar with the German law, and furnished a translation of the same. His testimony is that in Germany the standards as regards patentable invention is higher than elsewhere, with the result that it is difficult to secure a patent. Consequently, in past experience, minor or simpler inventions could not be protected under the patent law. To remedy such situation, the Gebrauchsmuster law was adopted, as supplementary legislation, to protect useful models which did not have as high a standard of invention as required by the patent laws. These laws, however, grant monopoly for such invention as is registered, limited to a term of three years, subject to be renewed for an equivalent period. The law provides that the owner of the device shall have the exclusive right to make, use, and sell the same, and to recover damages for infringement of his rights. Solicitors in Germany file petitions for allowance of patents in the alternative, so that, if a patent be denied, a Gebrauchsmuster may be allowed. The applicant files a comprehensive title, and, if registry is granted, that title is published in the official Gazette. The application contains specifications and drawings, and the claim and description are registered and are open to examination at the Patent Office. True it is there is no examination for novelty, but the same is true as to patents in many countries. In such situations the question of novelty first arises when a suit is brought.

■ I have examined the German laws as to patents and Gebrauchsmuster, and it is apparent that the same monopoly is granted under the Gebrauchsmuster law as under the patent law, but that it is more limited in time. The German laws provide for registry of designs under the Geschmachsmuster law, for useful models under the Gebrauchsmuster law, and for other inventions under the patent law. Evidently a Gebrauchsmuster is a patent within the meaning of the federal statute, as Judge Haight said in the case of Safety Gas Lighter Co. v. Fischer Bros. & Corwin (D. C.) 236 F. 955, 962: "The rights conferred on an inventor by a German Gebrauchsmuster, except as to time, seem to be quite as extensive as those guaranteed by a patent in this country. Its grant is the act of the government. Although only the title is published, in the sense that it is printed in an official publication, the specifications and drawings of the patent are open and accessible to the public, as are also the claims, which measure the scope of the protection afforded to the inventor, as soon as the title, date of application, and registration are published in the Patentblatt. As it is not essential that a foreign patent, to have the effect mentioned in section 4886 of the Revised Statutes, should be printed, but that the act of the officials in granting it and accessibility of its disclosures to the public are the decisive factors, I am at a loss to understand how the fact that only a title is printed, or how the scope of the invention which it protects, or that the examination made in the Patent Office before it is granted is limited, can have any effect on it under our laws."

Leister German patent, No. 211,064, granted January 23, 1908, disclosed an apparatus comprising a container, one or more gravel beds, and a bed of zeolite. The water passed into the container downwardly through the sand into the zeolites, then outwardly from the bottom into the water service line. To regenerate, a salt solution was supplied through the pipe passed upwardly through the zeolite bed, out into the waste pipe. After regeneration, the zeolites and gravel are rinsed. There is some contention that Leister had no unconfined bed. He expressly states, however, that the beds are separated from each other by spaces, and the drawings indicate free spaces above both the gravel and the zeolite beds.

Defendant presents a thesis by one Weiss published June 3, 1910, less than two years prior to the filing date of the Gans patent, but earlier than any date established by plaintiff of its introduction of its alleged invention into this country. This thesis discloses a casing, near the lower end of which there is a mechanical filter 0.20 of a meter high, a bed of zeolites 0.70 of a meter high, and then at a distance of 0.50 of a meter above the zeolite bed another mechanical filter 0.25 of a meter high; and, in addition, a stirring device similar to that shown in the

Gans patent. This reference discloses a free space above the zeolite bed. The apparatus was tested out at the city waterworks in the city of Glogau, Germany, in 1908, and thereafter in January and February of 1909. From the evidence submitted it seems that Gans, in his article of 1909, was discussing this Glogau installation.

January 27, 1909, there was published in the Technische Rundschau an article which discloses a softening device contained in a cylindrical casing with a conical bottom. Above the cone-shaped bottom, on a perforated plate, was coarse gravel, on this fine gravel and on top of this, zeolites, covered with a loose, uniform layer of excelsior, held down by a perforated cover, over which a canvas was stretched. Water passed into the casing at its lowest point, rose upward through the gravel, zeolite, and excelsior to the distributing pipes, emerging soft. The article discloses that the exhausted zeolites were regenerated by a salt solution supplied through a pipe controlled by a valve, passing downwardly through the zeolites. The salt solution apparently passed out through the pipe attached at the lowest point of the casing. The filter was washed out with water passed upward through the filter. Plaintiff raises a question as to whether the draining of the salt solution is from the lowest point of the casing.

Defendant built a softener in accordance with its understanding of this article, and operated the same at the Hawthorne Laundry. Plaintiff's experts admitted that the operation was successful; the only dispute being as to whether or not, in the structure made by defendant, the bed of excelsior was located and confined in the same manner as indicated in the Rundschau article. After considering all of the evidence, the court is of the opinion that the construction in question was in substantial accordance with the disclosure of the Rundschau article.

I have discussed the prior art references at some length, because these claims have been held valid by the Courts of Appeals for the Second and Sixth Circuits in the cases herein first cited. Those courts, at one time or another, had before them all of the references mentioned herein, except the Weiss Thesis. Having the greatest respect for those courts, I have taken great care in my examination of the prior art and of the evidence here presented in order to determine whether my convictions in the contrary direction are proper. To me it seems manifest that, had this situation been as fully presented to the various courts before whom there has heretofore been

litigation as here, there could have been but one conclusion. As stated by the Supreme Court in Mast et al. v. Stover Mfg. Co., 177 U. S. 485, at page 488, 20 S. Ct. 708, 710, 44 L. Ed. 856: "Comity persuades; but it does not command. It declares, not how a case shall be decided, but how it may with propriety be decided. It recognizes the fact that the primary duty of every court is to dispose of cases according to the law and the facts; in a word, to decide them right. In doing so, the judge is bound to determine them according to his own convictions. If he be clear in these convictions, he should follow them. It is only in cases where, in his own mind, there may be a doubt as to the soundness of his views that comity comes in play and suggests a uniformity of ruling to avoid confusion, until a higher court has settled the law. It demands of no one that he shall abdicate his individual judgment, but only that deference shall be paid to the judgments of other coordinate tribunals. Clearly it applies only to questions which have been actually decided, and which arose under the same facts."

Plaintiff contends that the prior art references from Germany are not sufficiently clear to prove anticipation, and, in view of the uncertainty of certain translations, it may be that the teachings are not of sufficient degree of certainty to satisfy the requirements stated by the Supreme Court as necessary to support anticipation. But Gans was bound by the teachings of the prior art, and the question arises whether, with those teachings in mind, he exercised merely the mechanical skill of one learned in his profession, or achieved invention.

The reasons ordinarily urged against foreign teachings do not find the usual basis here, for the applicant resided in Germany; the publications were published there, some by himself, some by his associates, some by scientists like himself. It was in America that he applied for a patent, upon claims never submitted to his own government, to a Patent Office obviously without notice of these German publications. He assigned his application, and eventually it came to the plaintiff, some of the officers of which were associated with him in Germany. Yet we do not have his story of his experiences.

What had the art taught Gans when he filed his application? His own patents on zeolites and his article of April 15, 1909, demonstrate that he had learned how to make zeolites, what their properties were, and how to make a softening apparatus. He had the benefit of Feldhoff's teaching of 1907, of the

Technische Rundschau article in January, 1909, and of the Weiss Thesis early in 1910. He knew what Leister had patented; he knew the titles of the two German Gebrauchsmuster, registered and published to the world. He knew everything reasonably to be drawn from the prior art as hereinbefore set forth, and that, it seems apparent to the court, furnished everything that any one skilled in the art would need in order to perfect the apparatus produced. Neither the idea of the container nor that of a bed of zeolites was new. Others had produced a softening apparatus with a layer of sand, and on top of it a layer of zeolites. There were many filtering devices containing means for the passage of water through the casing; for cutting off the supply of the water; and for passing through the casing regenerating solution. Indeed, plaintiff's asserted patentability of the claims is ultimately confined to the element that the unconfined bed of zeolites in a downward flowing softener shall be free and unconfined, and upon claim 5 to the same in upward flowing types also and the additional element of attaching the drain for the salt solution at the lowest point of the casing. Only these elements are left to save plaintiff's claim of invention.

To say the claims include as an essential requirement that the bed shall be unconfined is to read into the claim something that is not stated in specifications, description, or claim, but which defendant insists must be implied because of the so-called stirring apparatus, which is never used, and the statement as to backwashing. Obviously neither implication is necessary or logical. Backwashing, under the evidence, may be accomplished whether there be an unconfined bed or not, though it may not be so efficient in a confined bed. Furthermore, the stirring apparatus can be used in a confined bed, it being necessary therewith simply to run the pinion, upon which the stirring apparatus turns, through the cover confining the zeolites, and attach thereto, below the cover, the stirring blades.

I am of the opinion that there is no warrant for reading into claim 1 any requirement that the bed of zeolites shall be free, but, as stated, if that element is necessarily implied, it likewise is imported in the prior art, as shown by Gans' own publication, for, if backwashing in the patent implies a free bed, so backwashing in his early article, dealing with the same subject matter, must import the same conclusion.

Furthermore, the testimony of the plaintiff's president and the language of the prior publications is such that Gans was bound to know, and did know, as early as the latter part of 1907, or the early part of 1908, that some of the people skilled in the art believed that the body of zeolites should be free and unconfined, and that he himself made a device with such a bed more than two years prior to the filing of his application. In other words, the state of the art in 1909 was such that he and his associates believed that in an apparatus, such as any of them described, a free and unconfined bed of zeolites would prove the more practicable.

Then, too, I am not willing to say, even if some may believe that the idea of a free bed of zeolites were not in the prior art, that the addition of the same to the combination amounted to invention. Gans knew the properties of zeolites; he knew that in order to function they must be charged with salt, and, when exhausted, recharged; that mechanical filters were desirable to eliminate the physical impurities of water; and that, after regeneration, the container and its contents should be rinsed of excess salt. He knew that the nature of any material like zeolites or sand is such that, in order that they may be thoroughly cleansed, the granules should, as nearly as possible, be in suspension, exposing all their sides to the liquid in which they are bathed. He knew that, if he wanted to wash sand, he could best do so when it is an uncompacted or suspended mass, and that the same was true of zeolites. It was therefore obviously necessary that, to get complete submersion, he must leave the upper part of the zeolites to a certain extent at least unconfined. He knew further that, in order to secure lack of compactness or suspension, there must be some free space above the body of zeolites, furnishing room for expansion when flooded with water. I do not believe that, even though we read into these claims an unexpressed intention on the part of Gans that the body of zeolites should be open, and even though the idea of a free space was not old, the result amounted to anything more than the natural and obvious method of meeting the problem by one skilled in the art.

As to claim 5 we have even a more weak assertion as to one element—means for removing the salt connected to the lowest point of the container. It was the addition of that element only that procured the allowance of the claim. Was this invention? Suppose we have before us an apparatus as claimed in claim 5 without this last element? What is the easy, natural, and obvious manner in which to drain the salt solution, which, following the course of gravitation goes to the bottom of the casing? A school boy would

reply that the obvious manner is to put a plug and tap at the lowest point.

A multiplicity of elements may be added indefinitely without creating a patentable combination, unless by their collocation a new result is produced. The adding of a plug and connecting the same to a waste pipe, in order to drain off the solution of salt from Gans' container, was merely solving the problem of a plumber.

I am of the opinion, further, that the Patent Office was right in its conclusion that in substance the claims are merely reproductions of structures found in the prior art; that in such filters as those in Jewel No. 478,261, July 5, 1892, Bachman No. 678,532, July 16, 1901, and Driesbach No. 630,870, we find apparently a free and unconfined bed, the elements injected into these claims by the Court of Appeals for the Sixth and Second Circuits in order to validate the same. Remembering the comments of the Patent Office upon the Bommarius patents, observing that the plaintiff at the present time manufactures sand filters of the same structure as zeolite softeners, it seems clear that there was no invention in either claim because of the substitution of zeolites. Duggan, technical manager of the plaintiff, in March, 1920, wrote a letter, in which he said: "The process is a very simple one as you will notice by the literature which we enclose. It is nothing more or less than a filter, but the bed, instead of being sand or some other material, is a zeolite which is manufactured in our factory in Brooklyn."

True it is that the process of softening involves a chemical change as the water passes through the zeolites, whereas the purification of water through sand involves only the removal of physical impurities, yet the mere substitution of the zeolites for sand is not invention, in view of the fact that zeolites themselves were previously patented by Gans. (No. 943,535, reissue thereof No. 13,688, and No. 960,887.) He undoubtedly accomplished invention in those patents, but, when he merely adapted the sand filter construction to the use of zeolites by substituting the latter for sand, he did not accomplish invention. The art of filtering and that of softening, if not identical, are surely analogous. Jay v. Weinberg et al. (C. C. A. 7) 262 F. 973.

From what has been said it is apparent that there should be a decree dissolving the temporary injunction heretofore entered, declaring claims 1 and 5 invalid for want of invention, and dismissing the bill for want of equity at the cost of plaintiff.