The **BENDIX CORPORATION**, a corporation of Delaware, and Sellew Corporation, a corporation of Illinois, Plaintiffs-Appellees (Cross-Appellants),

v.

**BALAX, INC.**, a corporation of Wisconsin, and John M. Van Vleet, an individual, Defendants-Appellants (Cross-Appellees).

Nos. 17343, 17344.

United States Court of Appeals, Seventh Circuit.

Jan. 30, 1970.

Rehearing Denied March 9, 1970.

Daniel C. McEachran, Alfred H. Plyer, Jr., Chicago, Ill., John R. Collins, Milwaukee, Wis., for plaintiffs-appellees; Parker, Carter & Markey, Chicago, Ill., Foley, Sammond & Lardner, Milwaukee, Wis., of counsel.

S. L. Wheeler, Maxwell H. Herriott, Thomas O. Kloehn, Milwaukee, Wis., Edward A. Haight, John W. Hofeldt, Chicago, Ill., for defendants-appellants; Haight, Hofeldt & Davis, Chicago, Ill., Wheeler, Wheeler, House & Clemency, Quarles, Herriott, Clemons, Teschner & Noelke, Milwaukee, Wis., of counsel.

Before CASTLE, Chief Judge, HASTINGS, Senior Circuit Judge, and FAIRCHILD, Circuit Judge.

HASTINGS, Senior Circuit Judge.

Plaintiff's predecessor brought this action charging defendants with infringement of three of its patents and with appropriation of its trade secrets. Defendants counterclaimed charging plantiff with violations of the antitrust laws.

The original plaintiff was Besley-Welles Corporation, an Illinois corporation. After this suit was commenced its assets were acquired by Bendix Corporation of Delaware. Its business is now operated as a division of Bendix. The defendants are Balax, Inc., a Wisconsin corporation, and John M. Van Vleet, Balax's founder and president, a resident of Wisconsin.

Before trial, plaintiff withdrew its patent No. 2,991,491, admitting its invalidity due to plaintiff's own prior public use. The trial court held plaintiff's Patent Re. 24,572 valid and infringed; it held plaintiff's Patent No. 3,050,755 in-

fringed but invalid for prior public use by plaintiff; it dismissed that portion of the complaint charging defendants with appropriation of plaintiff's trade secrets; it dismissed defendant Van Vleet as an individual defendant; it denied plaintiff's request for treble damages and attorneys' fees; and it dismissed defendants' antitrust counterclaim.

In No. 17343, defendants appeal from those parts of the judgment herein holding Patent Re. 24,572 valid and infringed and denying relief to defendants on their counterclaim charging plaintiff with violations of the antitrust laws. Affirmatively, defendants seek an award of attorneys' fees, a decree finding plaintiff in violation of the Sherman Act and a remand to determine damages allegedly suffered by defendants.

In No. 17344, plaintiff appeals from those parts of the judgment herein holding its Patent No. 3,050,755 invalid; dismissing that part of the complaint charging defendants with appropriation of its trade secrets; dismissing Van Vleet as an individual defendant; and denying plaintiff's request for treble damages and attorneys' fees.

The two remaining patents involved in this litigation both relate to a device known as a fluteless swaging tap. Patent Re. 24,572, hereinafter referred to as the reissue patent, covers the tool itself. Patent 3,050,755, hereinafter referred to as the '755 or method patent, covers the method performed by the tool.

A tap is a tool used to form threads on the cylindrical inner surface of a hole. A swaging tap forms threads by deforming the metal and displacing it into the form of the desired thread. A swaging tap, which forms no chips, is to be distinguished from a cutting tap which forms threads by cutting away the metal with cutting teeth. The swaging method is said to be more economical and easier to perform than the cutting method. Swaging taps have a longer life than cutting taps. They produce no metal chips. The costly and time consuming inspection and cleaning of the work after the job is completed is thus eliminated.

As found by the trial court, Patent Re. 24,572 is a reissue of U. S. Patent No. 2,807,813. This tap has a shank and a threaded section. The threaded section has a cylindrical portion where the threads are substantially the same diameter and a tapered end portion where the threads are of reduced diameter. The threads have high spots or lobes with relieved areas in between these high spots. It is the lobes that do the actual swaging work since the relieved areas are out of contact with the material being formed. When used, the tool is rotated into a hole and the lobes force their way through the hole. The displaced metal takes the shape of the tap threads.

The method of the '755 patent is performed when the tool of the reissue patent is used in the prescribed manner. The method claims describe the application of pressure from the tap threads and the movement of the metal as it conforms its shape to that of the tap thread.

PATENT RE. 24,572—VALIDITY

Defendants urge several reasons for the invalidity of the reissue patent. Their first contention is that it is anticipated by the 1939 German Gebrauchsmuster Patent 1,455,626 (GM). Section 102(b) of Title 35, U.S.C.A. provides: "A person shall be entitled to a patent unless— * * * (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States * * *."

■ A GM is clearly a patent within the meaning of this section, but it is not a printed publication. American Infra-Red Radiant Co. v. Lambert Industries, Inc., 8 Cir., 360 F.2d 977, 991–994, cert. denied, 385 U.S. 920, 87 S.Ct. 233, 17 L. Ed.2d 144 (1966); Permutit Co. v. Wadham, 6 Cir., 13 F.2d 454, 458

(1926); Reeves Bros., Inc. v. United States Laminating Corp., 282 F.Supp. 118, 134–136 (E.D.N.Y.1968); Permutit Co. v. Graver Corp., 37 F.2d 385, 390 (N.D.Ill.1930), aff'd on other grounds, 7 Cir., 43 F.2d 898, 902 (1930), aff'd 284 U.S. 52, 52 S.Ct. 53, 76 L.Ed. 163 (1931); and Safety Gas Lighter Co. v. Fischer Bros. & Corwin, 236 F. 955, 962 (D.N.J.1916), aff'd, 3 Cir., 247 F. 1005, 159 C.C.A. 652 (1918).[1]

■ On this basis, all parties agree that only that which is "patented" by a GM may be considered as prior art under Section 102(b), *supra*. Subject matter which is ancillary to, but not a part of, the patented subject matter may not be considered. The district court so held. The disagreement between the parties concerns the method of determining what is "patented" by the Gebrauchsmuster in question.

The trial court held that a GM "patents" only that which is disclosed by the bare words of its claims. It relied on language in *Reeves, supra,* in holding that it is never permissible to look to the specifications of a GM in construing its claims. The *Reeves* court had said: " * * * for anticipation purposes under Section 102 a GM * * * is a reference only for what is patented, *i. e.,* for what it claims and not, for what is

disclosed in its specifications." 282 F. Supp. at 136.

Defendants maintain that the claims of a GM are to be construed in light of its specifications and seek to distinguish *Reeves.* They note that in *Reeves* a GM was cited as a reference against a process patent and that a GM is by definition a patent only on an article and never on a process. From this they conclude the *Reeves* court ignored the specifications only because they referred to a process.

However, the *Reeves* court clearly recognized that an article patent may in some cases anticipate a process. Such would be the case where "a process in one patent can produce only one article and that article is definitely covered by what is claimed in another patent [*e. g.,* in an earlier GM] * * *. [B]ut this alone may not be sufficient to treat the article patent as an anticipation of the process patent, if many processes are described in the article patent while only one specific process is described in the process patent." 282 F.Supp. at 136–137.

The patent in suit in *Reeves* claimed a method of laminating a sheet of plastic foam to a sheet of fabric by the application of heat from a gas flame. The GM cited against it claimed a fabric lined

---

1. A number of the opinions above cited ably set forth the nature of a Gebrauchsmuster. The latest such effort is that of Judge Bartel in *Reeves Bros., supra* at 134–135. "[A] Gebrauchsmuster is registered under the German law after an application filed in the German Patent Office. If the application meets the requirements of form and content, the GM is issued without any novelty search and is accompanied by the publication of an official notice in the German Official Gazette that it has been so issued. There is no requirement of nonobviousness in order to obtain a GM, and its purpose is to enable the applicant to obtain a speedy protection for a new article and if desirable, to concurrently seek a regular patent, a procedure which would consume much more time. After registration the specifications and claims become available to the public and anyone has free and

open access to the same. The GM was not a printed publication at any time and is referred to as a utility model. It is limited to a maximum of six years instead of eighteen years, covers only articles and never can cover processes as such, and grants to the inventor the exclusive right to prevent others from making, using or selling his article and also to recover damages for any infringement. * * *
"By a directive issued to its examiners in 1965, the United States Patent Office resolved certain prior inconsistent practices as to the treatment of GMs and stated that GMs may be considered as patents for anticipation purposes within the purview of Section 102. Official Gazette of the United States Patent Office, Nov. 2, 1965, Vol. 820, No. 1." (Footnote omitted.)

foam material with the fabric bonded directly to the foam. The specifications of the GM described the process by which the article could be made indicating the application of heat from heated rollers, hot gas, infrared light, or high frequency current.

When the language of *Reeves* is read in light of these facts, it is clear to us that it calls for neither an absolute rule that GM specifications may never be resorted to, nor an absolute rule that they may always be resorted to in interpreting the claims. Rather, it is consistent with our own judgment as to the correct rule. We conclude that the specifications of a GM may be resorted to for the purpose of clarifying the meaning of the language used in the claims, but may not be resorted to for the purpose of adding completely new material to that which is disclosed by the claims.

For example, in *Reeves* the GM claims disclosed an article which could have been produced by several processes. The court had held that in such a case the article patent could not anticipate any one of those processes when cited against a patent specifically claiming one of them. Therefore, resort to the specifications there to learn in what manner the claimed article was actually produced would have added wholly new matter to the claims. Without the specifications, the *Reeves* claims could anticipate no process, but with them, the claims would anticipate a process as well as an article. *Reeves* was thus a particularly clear case of specifications adding new matter to what was "patented" by the claims, rather than simply giving meaning to the words of the claims for the purpose of determining what was "patented" by them.

Each case will, of course, turn on its own facts. In each case the question will be "What is 'patented'?" The specifications of the GM may be resorted to if necessary to clarify the meaning of the words of the claim—*to determine what* it is that the claims "patent" *but not to add to* what they patent.

Thus, the double question here is whether resort to the specifications is necessary to determine what is patented and whether such resort may be taken without increasing the scope of what is patented.

The claims of the GM cited against the reissue patent in suit are:

"1. Thread pressing tap for the chipless production of inner threads, characterized in that the thread tap (a) provided with a continuous, i. e., uninterrupted thread along the circumference of its thread cross section (b, c, d) is undulatingly formed over its entire length or partly, and, consequently, has continuous or interrupted depressions (f, f', f'') extending longitudinally axially, as well as spirally axially or otherwise, which though they recede with respect to the outer circumference (g, g' g''), nevertheless have the thread extend over their circumferential surface in the profiling of the thread to be cut and otherwise along the circumference of the tap.

"2. Thread pressing tap for the chipless production of inner threads in accordance with claim 1, characterized by the shape, disposition and arrangement reflected by the drawing and the specification."

These claims make clear that what is patented is a swaging tap, i. e., a "tap for the chipless production of inner threads." They also make clear that the patented tap is of a particular form and shape—one "characterized by the shape, disposition and arrangement reflected by the drawing and the specification." However, by this cross reference, the words of the claims leave unclear exactly what the "shape, disposition and arrangement" of the patented article is meant to be. Thus, it is plainly necessary in this case to resort to the specifications to determine what is "patented" by the claims.

It is just as plainly possible to take such resort without increasing the scope of what is patented by the claims. The claims clearly profess to patent a partic-

ular article of a particular shape, disposition and arrangement. They also clearly indicate how such particular shape, disposition and arrangement is to be determined. Claim 2 is an obvious incorporation by reference and makes the specifications and drawings as much a part of the claim as if they were reproduced verbatim in the claim. Without such an incorporation, Claim 2 would be meaningless.

The trial court completely disregarded Claim 2. It reasoned that to give it any effect would undermine its conclusion as to the proper construction of a Gebrauchsmuster: "Claim 1 is the only real claim of the GM. Claim 2 incorporates by cross reference 'the shape, disposition and arrangement reflected by the drawing and the specification.' However, to allow such a cross reference would defeat the limited use which this court has concluded must be made of the GM."

We do not agree that allowing the obviously intended cross reference to the specifications here defeats the limitations to which Gebrauchsmusters are admittedly subject. We allow such cross reference not to increase the scope of what is patented by the Gebrauchsmuster claims but only to accomplish the task at hand of determining what it is that those claims patent.

The use of GM specifications which we here find proper is fully supported by the German practice. Under that practice, while claims are frequently used, they are not required, and the entire specification will be construed in determining what is patented. The advisory explanations accompanying the German Regulations regarding "the application for Gebrauchsmuster" provide:

"Indication of Novelty.

According to sec. 2 paragraph 2 of the statute, the application must specify 'what purpose of work, or utility, the new form or device is intended to serve.' Since this indication is of importance for the range of the legal protection corresponding with the recording, applicant will do well in many cases, even tho the law does not prescribe the setting of a protection claim, to summarize separately from the description, in the type of construction of a patent claim, the legally protectable characteristics of the model." Patents and Gebrauchsmuster in International Law, Emerson Stringham, Pacot Publications, Madison, Wisconsin, 1935, p. 248.

Stringham comments:

"Scope of protection involves much the same problems which arise everywhere in patent law. The German statute requires no claim for Gebrauchsmuster. The tendency, during a decade or so, of the Reichsgericht to hold itself not bound by the statutory claim of the long-term patent, finds freer play with Gebrauchsmuster; * * *." Id. at 255.

Having concluded that what is patented by Gebrauchsmuster Patent 1,455,626 should have been determined by construing its claims in the light of its specifications rather than on the bare words of the claims, it becomes necessary to determine whether that patent, properly construed, does anticipate, and thus invalidate, plaintiff's Patent Re. 24,572 in suit.

Plaintiff's expert testified, and the district court found, that on its construction of the GM, the GM lacked several elements claimed by plaintiff's reissue patent. The first element found wanting was a "continuous thread * * * of substantially equal depth taken in all planes intersecting the axis of said tool longitudinally thereof * * *." This element is clearly present when the claims of the GM are read in light of the specifications and drawings. Claim 1 of the GM calls for "a continuous, i. e., uninterrupted thread along the circumference of [the tap's] thread cross section (b, c, d) * * *," and specifically notes that the thread continues through the "depressions (f, f' f'')" of the tool which "have the

thread extend over their circumferential surface in the profiling of the thread to be cut * * *." The GM specifications note that the entire thread shaft is "continuously covered with a thread which, as far as its profile and its pitch are concerned, is equivalent to the thread to be cut." Figure 3 of the GM drawing, reproduced below, clearly shows a uniform tooth depth.

[A917]

Two further elements the trial court found wanting in the GM relate to the tapered end portion of plaintiff's tap. One element describes the tapered portion and the second element provides for a continuous thread between the tapered portion and the cylindrical portion of the tap. Once again, these elements are clearly disclosed by the GM, properly construed. Claim 1 of the GM calls for an "uninterrupted thread along the circumference of [the tap's] thread cross section (b, c, d) * * *." The required reference to "(b, c, d)" on the GM drawings shows that the thread cross section of the GM is indeed tapered and confirms that the thread is continuous between the tapered and the cylindrical portions of the thread cross section. Plaintiff does not contest the fact that these two elements are contained in the GM if reference may be had to the specifications and drawings.

The final element found wanting in the GM by the trial court relates to making the tap of appropriate size for the drilled hole it is going to tap, "the extreme pitch diameter of the thread on the cylindrical portion being generally of the order of the diameter of the cylindrical surface to be threaded." What this means is that the tap should not be used in a hole the size of the maximum crest diameter since it would not form any threads nor should it be used in a hole as small as the root diameter since there would be no space for the metal displaced from the walls of the hole to flow; rather it should be used in a hole about midway between the two. The GM drawing, Fig. 4, shows a pitch diameter slightly larger than the hole to be tapped, but appears to be "of the order of the diameter of the hole." In any event, the GM specification contemplates that the pitch diameter be adequate so that metal may be displaced inwardly. Furthermore, we think it would be obvious to one using such a tap that it would have to be used in a hole small enough to allow the swaging lobes to come in contact with the metal to be swaged and large enough to permit a space between the inner surface of the metal and the root of the tap into which excess metal can be displaced as the thread is formed.

Thus we conclude that all claims of the plaintiff's reissue patent can be found in the Gebrauchsmuster Patent 1,455,626 which was issued more than one year prior to plaintiff's application for its patent. We hold that the claims of plaintiff's Patent Re. 24,572 are in-

valid because of anticipation by the 1939 GM.

The district court also erred in concluding that the reissue patent was not invalid for obviousness in view of the prior art under 35 U.S.C.A. § 103.[2] This error resulted from the court's error of law as to the interpretation of the Gebrauchsmuster. Consistent with its interpretation of the GM for purposes of anticipation, it held that only the claims of the GM could be referred to on the obviousness issue. We have held that, on the facts of this case, the specifications as well as the claims are part of the prior art. In view of this prior art, we hold that the reissue patent is also invalid under Section 103.

Defendants urged several other grounds for the invalidity of the reissue patent in the trial court. All were rejected. Among these grounds were contentions that the reissue patent was anticipated by certain German literature and by various sales of taps in this country and that the reissue was obvious in light of the prior art taught by such literature and earlier tools. Since we have concluded that the reissue patent is invalid under the GM prior art, we need not reach these other contentions.

### PATENT RE 24,572—INFRINGEMENT

■ Since we have concluded that the reissue patent is invalid, it follows that the district court's determination that defendants' tap infringes it must be reversed. An invalid patent cannot be infringed. Scovill Mfg. Co. v. Goldblatt Bros., Inc., 7 Cir., 362 F.2d 777, 781 and cases cited therein.

■ We note, however, that had we found the reissue patent valid, the finding of infringement would have been af-

firmed. The district court found infringement under the doctrine of equivalents. Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). The finding of equivalency is one of fact and will not be set aside unless clearly erroneous within the meaning of Rule 52(a), Federal Rules of Civil Procedure. *Graver Tank, supra* at 609–610, 70 S.Ct. 854. We conclude that the finding here is supported by the record and defendants do not seriously contend that it is not.

However, defendants maintain that there is a file wrapper estoppel in the instant case which precludes the application of the doctrine of equivalency. The district court concluded there was no such estoppel here. It appears to us that the court reviewed both relevant files and applied the correct law in finding no estoppel. After careful consideration, we are not persuaded by defendants' contentions to the contrary.

### PATENT NO. 3,050,755—VALIDITY

The district court held plaintiff's '755 method patent invalid for plaintiff's own sales and the consequent public use more than one year prior to the application for patent. 35 U.S.C.A. § 102(b), *supra.* It found that when plaintiff's tap is used in the recommended manner, it inherently practices the '755 method. Plaintiff's taps were on sale and in public use in June, 1956. The application which resulted in the '755 patent was not filed until July 23, 1958.

Plaintiff concedes that "the District Court's holding of invalidity of the '755 patent because of such sales * * * is correct, *unless* the '755 patent is entitled to the April 3, 1956 filing date of the first filed swaging tap application." (Emphasis added.) It claims the earlier

---

2. "§ 103. Conditions for patentability; non-obvious subject matter

"A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made."

filing date by virtue of 35 U.S.C.A. § 120[3] which provides that an application for an invention shall have the benefit of the filing date of an earlier application under certain circumstances.

■ To come within the purview of Section 120, the later application must 1) disclose an invention disclosed in the manner provided in 35 U.S.C.A. § 112 in an earlier application; 2) be by the same inventor; 3) be filed before the patenting of the earlier application; and 4) contain a specific reference to the earlier application. Technicon Instruments Corp. v. Coleman Instruments Corp., 7 Cir., 385 F.2d 391, 393 (1967).

The district court found the first condition was not satisfied in the instant case for the reason that the earlier application did not disclose the invention in the manner required by Section 112, which, in relevant part, provides: "The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

The disclosure of the method invention in the first filed swaging tap application of April, 1956, consisted of a single paragraph which contained essentially a description of how the tap was to be used rather than a description of a method of forming threads. This method was set out in detail for the first time in the 1958 method patent application and covered seven paragraphs in addition to the one contained in the 1956 application. The district court held that when these descriptions are compared, "it becomes reasonably clear that the disclosure of the original patent does not satisfy the requirements of § 112."

Plaintiff, however, asserts that the earlier application did disclose the method for the reason that "the mere disclosure of a device which inherently performs a function in a patent application also by necessity discloses that function * * *." It relies mainly on Technicon Instruments Corp. v. Coleman Instruments, Inc., 255 F.Supp. 630, 640–641 (N.D.Ill.1966), aff'd., 7 Cir., 385 F.2d 391, 393 (1967). Other cases may be cited for this same general proposition.[4]

However, these cases do not support plaintiff's contention that the '755 patent is entitled to the filing date of the first filed tap application. They deal with a basically different situation. They are relevant when explanatory material is added to a pending application to clarify the invention claimed in such application. Typically they deal with amendments to applications which have

---

3. " § 120. Benefit of earlier filing date in the United States

"An application for patent for an invention disclosed in the manner provided by the first paragraph of section 112 of this title in an application previously filed in the United States by the same inventor shall have the same effect, as to such invention, as though filed on the date of the prior application, if filed before the patenting or abandonment of or termination of proceedings on the first application or on an application similarly entitled to the benefit of the filing date of the first application and if it contains or is amended to contain a specific reference to the earlier filed application."

4. Weller Mfg. Co. v. Wen Products, Inc., 7 Cir., 231 F.2d 795, 799 (1956); Binks Mfg. Co. v. Ransburg Electro-Coating Corp., 7 Cir., 281 F.2d 252, 257 (1960); Illinois Tool Works, Inc. v. Continental Can Company, Inc., 273 F.Supp. 94, 101–104, aff'd, 7 Cir., 397 F.2d 517, 520 (1968); Oelbaum v. Lovable Co., 211 F. Supp. 594, 602 (S.D.N.Y.1962); Baldwin-Lima-Hamilton Corp. v. Tatnall Measuring Systems Co., 169 F.Supp. 1, 21 (E.D.Pa.1958); Interchemical Corp. v. Watson, 145 F.Supp. 179, 182, aff'd, 102 U.S.App.D.C. 149, 251 F.2d 390 (1958). See also Marconi Wireless Telegraph Co. v. United States, 320 U.S. 1, 34, 63 S.Ct. 1393, 87 L.Ed. 1731 (1942). But cf. Schriber-Schroth Co. v. Cleveland Trust Co., 305 U.S. 47, 58–59, 59 S.Ct. 8, 83 L.Ed. 34 (1938).

been rejected under 35 U.S.C.A. § 132.[5] That section provides for reexamination of applications after amendment but states: "No amendment shall introduce new matter into the disclosure of the invention."

In essence, the issue under consideration in the instant case is whether there was *adequate disclosure* in the original tool application to support the separate and distinct method invention. Here plaintiff does not seek merely the right to clarify overly broad or ambiguous claims. Rather, it seeks to use the concept of "inherent disclosure" in a manner which will result in extending its monopoly beyond the limits of the originally claimed invention.

We conclude, under the record before us, that the inherent disclosure relied upon by plaintiff is not adequate to meet the disclosure requirements of Section 112, *supra*. It necessarily follows that the requirements of Section 120, *supra*, have not been met.

■■ Accordingly, we hold the finding of the district court that plaintiff's method patent is not entitled to the April, 1956, filing date of the first filed swaging tap application is not clearly erroneous. We hold that plaintiff's Patent No. 3,050,755 is invalid by reason of its prior public use and plaintiff's sales in June, 1956.

## PATENT NO. 3,050,755—INFRINGEMENT

Again we note that an invalid patent cannot be infringed and hold the invalid method patent is for that reason not infringed by defendants' tap. *Scovill Mfg., supra.*

However, if the method patent were valid, defendants' tap would infringe.

The district court so held applying the doctrine of equivalency. As stated above, the finding of equivalency is one of fact and our review is limited by Rule 52(a), Federal Rules of Civil Procedure.

Claims 1 and 2 of the method patent describe a tap capable of applying pressure at "pressure areas * * * equally circumferentially spaced" on the cylindrical surface being swaged. The district court rejected defendants' contention that since their tap is incapable of applying such pressure, it cannot infringe. The court concluded that the only reason for this was the presence on defendants' tap of a groove which caused its lobes to be unequally spaced. This, the court found, made no difference in the operation of defendants' tap which would prevent it from infringing plaintiff's method patent. This conclusion is amply supported by testimony of plaintiff's expert which the court found uncontradicted by any testimony offered by defendants.

In the trial court, defendants further urged that Claims 1 and 3 require a tap whose threads along the whole of the cylindrical section apply equal pressure intensity as that applied by the last pressure area on the tapered lead section of the tap. They assert their tap is incapable of applying pressure in this manner since only the first lobe of its cylindrical section does any work.

The district court held that defendants were incorrectly interpreting the language of the claim. It held that when the claims were read in light of the specifications, they meant "that the pressure areas in the cylindrical section are equal in size and in pressure-applying *ability* as the last lobe on the tapered section * * * not * * *

5. "§ 132. Notice of rejection; reexamination

"Whenever, on examination, any claim for a patent is rejected, or any objection or requirement made, the Commissioner shall notify the applicant thereof, stating the reasons for such rejection, or objection or requirement, together with such information and ref-

erence as may be useful in judging of the propriety of continuing the prosecution of his application; and if after receiving such notice, the applicant persists in his claim for a patent, with or without amendment, the application shall be reexamined. No amendment shall introduce new matter into the disclosure of the invention."

that all the threads on the cylindrical section actually apply the same pressure as the last lobe on the tapered section." We agree that this is the correct interpretation of the claim language. When the claims of the method patent are so interpreted, the court's finding of infringement by equivalency is not clearly erroneous.

## DEFENDANTS' COUNTERCLAIM—ALLEGED ANTITRUST VIOLATIONS

■ Defendants' counterclaim to plaintiff's infringement suit charges two violations of federal antitrust laws. First, defendants contend that plaintiff violated Section 2 of the Sherman Act by "illegal procurement and enforcement of patents." They rely upon Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965). That reliance is misplaced in this case. *Walker* decided a purely legal issue, as the following passages from the opinion indicate:

"We have concluded that the enforcement of a patent procured by fraud on the Patent Office may be violative of § 2 of the Sherman Act provided the other elements necessary to a § 2 case are present. (*Id*. at 174, 86 S.Ct. at 349.)

\*　\*　\*　\*　\*　\*

"As the case reaches us, the allegations \* \* \* as to the fraud practiced \* \* \* [by the patentee] \* \* \* are taken as true. (*Id*. at 174–175, 86 S.Ct. at 349.)

\*　\*　.　\*　\*　\*　\*

" \* \* \* It must be remembered that we deal only with a special class of patents, *i. e.*, those procured by intentional fraud. (*Id*. at 176, 86 S.Ct. at 350.)

\*　\*　.\*　\*　\*　\*

" \* \* \* [The patentee's] good faith would furnish a complete defense. This includes an honest mistake as to the effect of prior installation upon patentability—so-called 'technical fraud.' " (*Id*. at 177, 86 S. Ct. at 350.)

Thus to prevail here, defendants must prove, what was assumed as true in *Walker*, that any misstatements by plaintiff in its patent applications were the products of intentional fraud and not good faith mistake. *See generally*, Antitrust Developments—1955–1968—Supplement to Report of the Attorney General's National Committee to Study the Antitrust Laws, 1955, pp. 167–69 (1968).

■ The district court specifically found that defendants had not met their burden of proving fraud on the patent office by clear and convincing evidence as required in Armour & Co. v. Wilson & Co., 7 Cir., 274 F.2d 143, 148 (1960). Our examination of the record leads us to conclude that such finding is not clearly erroneous and thus we accept it. Accordingly, the conclusion of the district court that this claim of antitrust violation is without merit should be approved.

Defendants next urge that even if all of plaintiff's patents were valid, plaintiff would be guilty of violations of Sections 1 and 2 of the Sherman Act for the reason that they have misused their patents to extend the patent monopoly beyond the scope permitted by the Constitution and the Congress.

■ It is clear that the patent monopoly is one strictly limited and that contracts and agreements extending its scope may violate federal antitrust laws. United States v. Univis Lens Co., Inc., 316 U.S. 241, 250, 62 S.Ct. 1088, 86 L. Ed. 1408 (1942). As stated by the Supreme Court, United States v. Masonite Corp., 316 U.S. 265, 277, 62 S.Ct. 1070, 1077, 86 L.Ed. 1461 (1942): "The owner of a patent cannot extend his statutory grant by contract or agreement. A patent affords no immunity for a monopoly not fairly or plainly within the grant. \* \* \* [I]t will not do to say that since the patentee has the power to refuse a license, he has the lesser power to license on his own conditions."

Defendants assert that plaintiff has "blanketed" 75% of the swaging tap market and "smothered most competition" by means of sales and licensing agreements with its competitors. The licensing agreements give competitors the right to make and sell swaging taps. The sales agreements give other competitors the right to buy taps and to become licensees at ·their option. Each agreement contains irrevocable covenants binding the purchaser or licensee never to contest the validity of plaintiff's patents, even if the agreement is terminated. Defendants contend that this network effectively excludes them from 75% of the swaging tap market because no swaging tap user bound not to contest the validity of plaintiff's taps can afford to risk the possibility of an infringement suit by buying swaging taps from defendants.

██ The district court found no merit in this claim saying, *inter alia,* " * * * there has been no sufficient showing of an illegal combination to restrain trade. By dint of its valid patent Re. 24,572, the plaintiffs were entitled to the limited protection afforded under the patent laws. This included the right to license others to manufacture the patented tap. It is inappropriate to denominate this conduct as 'conspiratory' or 'monopolistic'."

In this rather summary fashion the trial court brushed aside the charge that plaintiff had violated Sections 1 and 2 of the Sherman Act, finding that United States v. Masonite Corp., 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461 (1942), was not applicable.

While it is true that a valid patent does afford some "limited protection," including "the right to license others to manufacture the patented tap," this is no answer to the thrust of defendants' contention that the licensor may not thereby forever preclude the licensee from challenging the validity of the patent. By requiring such a condition in the license or sales agreement, plaintiff

may have placed itself in the position of unlawfully exceeding the protected area.

Further, subsequent to the judgment of the district court under consideration here, the Supreme Court in Lear, Inc. v. Adkins, 395 U.S. 653 (June 16, 1969), at 668–671, 89 S.Ct. 1902, 23 L.Ed.2d 610, overruled the holding of Automatic Radio Manufacturing Co., Inc. v. Hazeltine Research, Inc., 339 U.S. 827, 836, 70 S.Ct. 894, 94 L.Ed. 1312 (1950), insofar as it invoked a legally implied estoppel to deny a licensee the right to challenge the validity of his licensor's patent in a suit for the collection of royalties. The Court's decision is rationalized almost exclusively in terms of "the strong federal policy favoring free competition in ideas which do not merit patent protection." *Id.* 395 U.S. at 656, 89 S.Ct. at 1904.

The Court concluded that even a good-faith patentee-licensor should not be given the benefit of the estoppel doctrine since even in such cases the strong public policy reflected in the "federal law [that] requires that all ideas in general circulation be dedicated to the common good unless they are protected by a valid patent" overrides the equities of the licensor. The Court said: "Surely the equities of the licensor do not weigh very heavily when they are balanced against the important public interest in permitting full and free competition in the use of ideas which are in reality a part of the public domain. Licensees may often be the only individuals with enough economic incentive to challenge the patentability of an inventor's discovery. If they are muzzled, the public may continually be required to pay tribute to would-be monopolists without need or justification." *Id.* at 670, 89 S.Ct. at 1911.

The Court then went on to hold that the licensee would not be required to pay royalties accruing before an adjudication of invalidity even though that is what the express contract of the parties provided. Again the Court found such a result might frustrate federal policies

favoring free competition. *Id.* at 673–674, 89 S.Ct. 1902.

■ From all this we can only conclude that the right to estop licensees from challenging a patent is not part of the "limited protection" afforded by the patent monopoly. Furthermore, the reason is that it creates a danger of unwarranted monopolization. Such danger may be even greater here than in the usual licensee-estoppel case for the reason that in the instant case the licensor sought to create an irrevocable estoppel, not one merely extending during the life of the licenses and sales agreements.

The parties did not address themselves to the relevance, if any, of *Lear* in the present appeal, and, of course, it could not have been considered by the district court. Under these circumstances, we feel it should be first presented to the trial court for its consideration.

In light of our holding that Patent Re. 24,572 is invalid and the recent Supreme Court decision in *Lear*, we have concluded that the portion of the judgment below dismissing defendants' antitrust counterclaim should be vacated and the case remanded for reconsideration of that issue.

## OTHER ISSUES

■ In addition to its infringement claims, plaintiff also charges defendants with appropriation of its trade secrets. The district court carefully applied the governing Wisconsin law to the unfair competition claim by reason of its diversity jurisdiction. Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487 (1938). It concluded that while the information disclosed by plaintiff constituted trade secrets, no confidential relationship existed between the parties. Such a relationship is required to state a cause of action under Wisconsin law. Abbott Laboratories v. Norse Chemical Corp., 33 Wis.2d 445, 147 N.W.2d 529 (1967).

■ The record fully supports this finding and the court's conclusion that plaintiff did not sustain its burden of proving defendants appropriated trade secrets. The court noted plaintiff took no adequate precautions to protect its trade secrets from the defendants whom it should have regarded as potential competitors in the tap manufacturing business. The court specifically found there was not sufficient testimony to establish the existence of a joint venture which plaintiff now urges as the basis for the required confidential relationship. We agree and hold defendants are not liable for appropriation of plaintiff's trade secrets.

Plaintiff claims the trial court erred in dismissing Van Vleet as an individual defendant and in denying its request for treble damages and attorneys' fees. Defendants, on appeal, seek an award of their attorneys' fees.

We have carefully considered these issues and the record pertinent thereto and find that each of such claims is without merit. The trial court did not err in so ruling and we do not find adequate grounds for making an award of attorneys' fees to defendants.

In sum, on consideration of the foregoing, we conclude:

In No. 17343, that part of the judgment of the district court holding Patent Re. 24,572 to be valid and infringed is reversed; that part of the judgment dismissing defendants' antitrust counterclaim is vacated and set aside and this cause is ordered remanded to the district court for a reconsideration of such counterclaim; and defendants' claim for attorneys' fees is denied.

In No. 17344, the judgment of the district court is affirmed.

Reversed in part. Vacated in part and remanded. Affirmed in part.