129 F.3d 1463
 1997-2 Trade Cases P 71,973, 39 Fed.R.Serv.3d 402
 NOBELPHARMA AB, Plaintiff/Counterclaim Defendant-Appellant,
and
Nobelpharma USA, Inc., Counterclaim Defendant-Appellant,
and
Per Ingvar Branemark and Institute For Applied
Biotechnology, Counterclaim Defendants,
v.
IMPLANT INNOVATIONS, INC., Defendant Counterclaimant-Appellee.
 No. 96-1463.
 United States Court of Appeals,
Federal Circuit.
 Nov. 18, 1997.
Rehearing Denied; Suggestion for Rehearing In Banc Declined
April 29, 1998.
 
 Donald R. Dunner, Finnegan, Henderson, Barabow, Garrett & Dunner, L.L.P., Washington, DC, argued for plaintiff/counterclaim defendant-appellant and counterclaim defendant-appellant. With him on the brief were Robert D. Bajefsky and David A. Manspeizer. Of counsel on the brief were Robert A. Bourque, Kathleen M. Scanlon, and Lawrence M. Young, Simpson, Thacher & Bartlett, New York City, and Alan I. Becker, Burditt & Radzius, Chartered, Chicago, IL.
 D. Dennis Allegretti, Burns & Levinson, LLP, Boston, MA, argued for the defendant counterclaimant-appellee. With him on the brief were Stephen G. Rudisill, Arnold, White & Durkee, and Edward L. Foote and Peter C. McCabe, III, Winston & Strawn, Chicago, IL.
 Before RICH, PLAGER, and LOURIE, Circuit Judges.
 Opinion for the court filed by Circuit Judge LOURIE. Concurring-in-part and dissenting-in-part opinion filed by Circuit Judge PLAGER.
 LOURIE, Circuit Judge.
 
 
 1
 Nobelpharma AB and Nobelpharma USA, Inc. (collectively, NP) appeal from the judgment of the United States District Court for the Northern District of Illinois holding that (1) U.S. Patent 4,330,891 is invalid under 35 U.S.C. § 112, p 1 (1994), for failure to disclose the best mode of carrying out the invention, (2) Implant Innovations, Inc. (3I) did not infringe the '891 patent, and (3) NP was not entitled to JMOL or, in the alternative, a new trial following the jury verdict in favor of 3I on its antitrust counterclaim against NP, Dr. Per-Ingvar Branemark, and the Institute for Applied Biotechnology. See Nobelpharma AB v. Implant Innovations, Inc., 930 F.Supp. 1241 (N.D.Ill.1996). We conclude that the district court did not err in granting judgment that the patent is invalid as a matter of law at the close of NP's case-in-chief, but that it did err in denying NP's motion for JMOL on the antitrust counterclaim. Accordingly, the decision of the district court is affirmed-in-part and reversed-in-part.
 
 BACKGROUND
 
 2
 Drs. Branemark and Bo-Thuresson af Ekenstam are the named inventors on the '891 patent, the application for which was filed in 1980 and claimed priority from a Swedish patent application that was filed in 1979. The patent claims "an element intended for implantation into bone tissue." This "element," when used as part of a dental implant, is placed directly into the jawbone where it acts as a tooth root substitute. The implants described and claimed in the patent are preferably made of titanium and have a network of particularly-sized and particularly-spaced "micropits." These micropits, which have diameters in the range of about 10 to 1000 nanometers or, preferably, 10 to 300 nanometers, allow a secure connection to form between the implant and growing bone tissue through a process called "osseointegration."
 
 
 3
 Branemark is also one of the authors of a book published in 1977, entitled "Osseointegrated Implants in the Treatment of the Edentulous Jaw Experienced from a 10-Year Period" (hereinafter "the 1977 Book"). As its title suggests, this book describes a decade-long clinical evaluation of patients who had received dental implants. The 1977 Book includes a single page containing four scanning electron micrographs (SEMs) of titanium implants that exhibit micropits. The caption describing these SEMs reads, in part: "Irregularities are produced during manufacturing in order to increase the retention of the implants within the mineralized tissue." 3I determined, based on measurements and calculations that it presented to the trial court, that the micropits shown in the 1977 Book have diameters within the range claimed in the '891 patent. However, the 1977 Book does not specifically refer to "micropits."
 
 
 4
 In preparing to file the Swedish patent application, af Ekenstam submitted a draft written description of the invention to the inventors' Swedish patent agent, Mr. Barnieske. This draft referred to the 1977 Book in the following translated passage:
 
 
 5
 In ten years of material pertaining to titanium jaw implants in man, Branemark et al. [in the 1977 Book] have shown that a very high frequency of healing, as stated above, can be achieved by utilizing a carefully developed surgical technique and adequately produced implants.
 
 
 6
 However, Barnieske deleted all reference to the 1977 Book from the patent application that was ultimately filed in Sweden. Similarly, the 1977 Book is not mentioned in the U.S. patent application filed by Barnieske on behalf of Branemark and af Ekenstam.
 
 
 7
 In June 1980, while the U.S. patent application was pending, Branemark entered into an exclusive license agreement with NP covering the claimed technology.[1] Barnieske kept NP informed of the prosecution of the U.S. patent application and received assistance from NP's U.S. patent agent. The '891 patent issued in 1982; NP has since asserted it in at least three patent infringement suits.
 
 
 8
 In July 1991, while Branemark was a member of NP's Board of Directors, NP brought this suit alleging that certain of 3I's dental implants infringed the '891 patent. 3I defended on the grounds of invalidity, unenforceability, and non-infringement. 3I also brought an antitrust counterclaim, based in part on the assertion that NP attempted to enforce a patent that it knew was invalid and unenforceable. Specifically, 3I alleged that when NP brought suit, NP was aware that the inventors' intentional failure to disclose the 1977 Book to the U.S. Patent and Trademark Office (PTO) would render the '891 patent unenforceable.
 
 
 9
 During its case-in-chief, NP introduced portions of a deposition of Branemark that apparently was conducted several years before this trial began in connection with a lawsuit involving neither NP nor 3I. NP also introduced into evidence portions of that deposition that were counter-designated for introduction by 3I. Branemark's deposition testimony included his admissions that one "could consider" the procedure used to manufacture the micropitted surface a trade secret, and "it might be" that there are details "important to making" the micropitted surface that are not disclosed in the patent. At the close of NP's case-in-chief, the district court granted 3I's motion for JMOL of invalidity and non-infringement. The court held that the patent was invalid under § 112, p 1, for failure to disclose the best mode and that NP had failed to prove infringement. The court then denied NP's motion for JMOL on 3I's antitrust counterclaim, proceeded to inform the jury that the court had held the patent invalid, and allowed 3I to present the counterclaim to the jury.
 
 
 10
 After trial limited to the antitrust issue, the jury found in special verdicts, inter alia, that 3I had proven that (1) "the inventors or their agents or attorneys obtained the '891 patent through fraud," (2) NP "had knowledge that the '891 patent was obtained by fraud at the time this action was commenced against 3I," and (3) NP "brought this lawsuit against 3I knowing that the '891 patent was either invalid or unenforceable and with the intent of interfering directly with 3I's ability to compete in the relevant market." The jury awarded 3I approximately $3.3 million in compensatory damages, an amount the court trebled pursuant to section 4 of the Clayton Act, 15 U.S.C. § 15 (1994). The court declined to rule on whether the patent was unenforceable for inequitable conduct, concluding that its judgment of invalidity rendered the issue of enforceability moot. Nobelpharma AB v. Implant Innovations, Inc., 875 F.Supp. 481, 34 USPQ2d 1090 (N.D.Ill.1995).
 
 
 11
 The court then denied NP's renewed motion for JMOL on the counterclaim or, in the alternative, for a new trial on both the counterclaim and the infringement claim. Nobelpharma AB, 930 F.Supp. at 1246. In denying NP's post-verdict motion for a new trial on the issue of infringement, the district court again concluded that the patent was invalid for failure to disclose the best mode. Id. at 1247-49. The court also concluded that NP was not entitled to JMOL on the counterclaim because, inter alia, "NP, as the assignee of the patent, maintained and enforced the patent with knowledge of the patent's fraudulent derivation." Id. at 1257. The court denied NP's motion for a new trial on the counterclaim, holding, inter alia, that it did not err in its evidentiary rulings or in refusing to instruct the jury that in order to impose antitrust liability against NP, it must find NP's lawsuit "objectively baseless." Id. at 1264.
 
 
 12
 NP appealed to this court, challenging the district court's grant of 3I's motion for JMOL of invalidity and non-infringement and its denial of the post-verdict motion for JMOL or a new trial. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1) (1994).
 
 DISCUSSION
 A. Invalidity
 
 13
 At the close of NP's case-in-chief, the district court granted 3I's motion for judgment of invalidity under § 112, p 1, as a matter of law for failure to disclose the best mode of practicing the invention. NP then filed a motion for reconsideration, which was denied, in order to reopen the evidence and offer proof regarding its compliance with § 112, p 1. After the jury returned its verdict in favor of 3I on its antitrust counterclaim, NP moved for a new trial, again arguing that the court had erred in granting 3I's motion for JMOL. In reaffirming its decision to grant 3I's motion for JMOL, the district court held that Branemark's own testimony "demonstrates that when [he] filed his patent application, he contemplated a best mode of practicing his invention, but his disclosures were inadequate to enable one skilled in the art to practice that best mode." 930 F.Supp. at 1248. The district court also explicitly noted that its decision was not based on Branemark's purported "non-disclosure" of NP's later-developed manufacturing procedure. Id.
 
 
 14
 On appeal, NP again argues that the district court erred in granting JMOL on the invalidity issue because in doing so the court drew improper, unsupported inferences against NP and erroneously imposed on NP the burden of proving validity. NP also argues that the grant of JMOL denied it due process because the court had mandated a "natural order of proof" at trial and thus had effectively barred NP from introducing any evidence to show that it had satisfied the best mode requirement during its case-in-chief.
 
 
 15
 In response, 3I argues that Branemark's own unequivocal admissions indicate that he had developed and tested a preferred method of making the claimed implants when the patent application was filed. 3I also argues that Branemark admitted that the patent does not contain a disclosure adequate to enable one of ordinary skill in the art to practice this method. Finally, 3I argues that NP was not denied due process because NP had sufficient opportunity to offer evidence in opposition to 3I's motion for JMOL of invalidity and failed to do so. We agree with 3I that the court did not err in its grant of the motion for JMOL and therefore that the court did not err in denying NP's motion for a new trial on its infringement claim.
 
 
 16
 We review a district court's grant of a motion for JMOL under Fed.R.Civ.P. 50(a)(1) de novo by reapplying the standard applicable at the district court. See Allied Colloids Inc. v. American Cyanamid Co., 64 F.3d 1570, 1573, 35 USPQ2d 1840, 1841 (Fed.Cir.1995). Under that standard, we examine the record in the light most favorable to the non-movant, which in this case is NP, and afford it the benefit of all reasonable inferences. Id. Accordingly, "[w]e may affirm only if the judgment entered was the only one possible under the controlling law." Burroughs Wellcome Co. v. Barr Lab., Inc., 40 F.3d 1223, 1227, 32 USPQ2d 1915, 1919 (Fed.Cir.1994), cert. denied, 516 U.S. 1070, 116 S.Ct. 771, 133 L.Ed.2d 724 (1996) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (prohibiting JMOL "[i]f reasonable minds could differ as to the import of the evidence.")).
 
 
 17
 Rule 50(a)(1) provides, in relevant part, that if
 
 
 18
 a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law [JMOL] against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.
 
 
 19
 Fed.R.Civ.P. 50(a). "Thus, the verdict may be directed after the plaintiff's case is presented, when it is clear that completion of the trial is unnecessary in that the only sustainable verdict could be in favor of the defendant." Allied Colloids, 64 F.3d at 1573, 35 USPQ2d at 1841.
 
 
 20
 By statute, patents are presumed to be valid. 35 U.S.C. § 282 (1994). Thus, 3I had the burden of establishing by clear and convincing evidence facts supporting the conclusion that the '891 patent is invalid. See Transco Prods. Inc. v. Performance Contracting, Inc., 38 F.3d 551, 560, 32 USPQ2d 1077, 1084 (Fed.Cir.1994), cert. denied, 513 U.S. 1151, 115 S.Ct. 1102, 130 L.Ed.2d 1069 (1995). The patent statute requires that a patent specification "shall set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112, p 1 (1994). Determining whether a patent fails to comply with the best mode requirement and is thus invalid involves two factual inquiries. First, the fact-finder must determine whether at the time an applicant filed an application for patent, he or she had a best mode of practicing the invention, which is a subjective determination. Second, if the inventor had a best mode of practicing the invention, the fact-finder must determine whether the best mode was disclosed in sufficient detail to allow a skilled artisan to practice it without undue experimentation, which is an objective determination. See United States Gypsum Co. v. National Gypsum Co., 74 F.3d 1209, 1212, 37 USPQ2d 1388, 1390 (Fed.Cir.1996).
 
 
 21
 For whatever reason, NP introduced as part of its own case-in-chief all of the portions of Branemark's deposition that were counter-designated by 3I.[2] These included Branemark's statements, introduced by and unchallenged by NP, that (1) "there were some minor details that were not included [in the patent] and which proved to be quite important," (2) other skilled artisans would have to be "lucky" to obtain a suitable micropitted implant "by cutting a piece of titanium at a speed less than twenty meters per minute," the cutting speed disclosed in the patent, and (3) "any of the small detailed recipes that I discussed but did not specify" in the patent "can cause you to fail to get micropitting even though you were cutting the metal at less than twenty meters per minute." The record also unambiguously indicates that when he filed his patent application, Branemark was aware that a variety of undisclosed machining parameters were critical to the production of a functional implant, i.e., one that would allow for osseointegration. Moreover, the research on which the 1977 Book was based also indicates that Branemark possessed a preferred mode of making the claimed implants by the time the U.S. patent application was filed in 1980. Thus, the evidence at trial leads to only one reasonable conclusion: Branemark possessed a preferred method of making the claimed invention and failed to disclose it sufficiently to enable those skilled in the art to practice that method.
 
 
 22
 Normally, evidence presented by a patentee-plaintiff will not support a grant of a JMOL invalidating a patent. That is because the burden is on an accused infringer to show by clear and convincing evidence facts supporting the conclusion that the patent is invalid. See generally 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 2535, at 325 (2d ed. 1994) ("[C]ourts often caution that granting a [JMOL] for the party bearing the burden of proof is reserved for extreme cases."). Accordingly, grant of JMOL in favor of a party bearing the burden of proof may be granted only where (1) the movant "has established [its] case by evidence that the jury would not be at liberty to disbelieve" and (2) "the only reasonable conclusion is in [the movant's] favor." Hurd v. American Hoist & Derrick Co., 734 F.2d 495, 499 (10th Cir.1984). However, in unusual cases, an admission made by a plaintiff's witness can be sufficient to support entry of a JMOL in favor of a defendant after the close of the plaintiff's case-in-chief, even where the defendant bears the burden of proof on the decided issue. See, e.g., Falco Lime, Inc. v. Tide Towing Co., 29 F.3d 362, 365-66 (8th Cir.1994) (holding that JMOL was properly granted after the close of plaintiff's case in view of the admissions of plaintiff's chief witness regarding a contract that established defendant's affirmative defense). Given Branemark's admissions, we conclude that this is one of those "extreme" cases in which it was not improper to grant JMOL in favor of a defendant on an issue regarding which it bore the burden of proof.
 
 
 23
 Contrary to NP's arguments, the district court did not draw adverse inferences against NP to support its judgment. Rather, it properly relied on a co-inventor's statements "that the jury would not be at liberty to disbelieve." Hurd, 734 F.2d at 499. Similarly, the district court did not place the burden of proving validity on NP. The court did not have to shift the burden of proof because NP's own evidence was clear and convincing that the patent is invalid. This evidence led to "the only reasonable conclusion." Id.
 
 
 24
 We also agree with 3I that NP was not denied due process. When NP was confronted with 3I's motion for JMOL, it was not unfairly surprised. 3I had consistently alleged that the '891 patent was invalid under § 112, p 1. Moreover, NP had an opportunity to oppose 3I's motion, but it failed to do so adequately. After the court's grant of JMOL, NP responded by offering evidence and argument only concerning NP's later-developed manufacturing procedure. However, as noted above, the district court's ultimate decision did not rely on the "non-disclosure" of NP's later-developed manufacturing processes. Likewise, in affirming the decision of the district court, we do not rely on that evidence. Rather, we rely only on the clear and convincing evidence that Branemark failed to disclose his best mode of practicing the claimed invention when he filed his patent application. NP failed to present any evidence or argument to undermine the import of that evidence, even though it knew that the best mode issue was before the court; it thus had ample opportunity to prepare and present evidence and argument. Whatever disadvantage NP may have suffered when the JMOL was granted was rectified by the opportunity it had after the judgment was rendered. Any error was thus harmless. NP was therefore not denied due process.
 
 
 25
 Accordingly, we affirm the judgment that the '891 patent is invalid as a matter of law under § 112, p 1, for failure to disclose the best mode of practicing the invention. Because we affirm the district court's decision holding the patent invalid, we need not consider NP's arguments concerning infringement. See B.F. Goodrich Co. v. Aircraft Braking Sys. Corp., 72 F.3d 1577, 1583, 37 USPQ2d 1314, 1319 (Fed.Cir.1996).
 
 B. Antitrust Counterclaim
 
 26
 After the jury returned its verdict in favor of 3I on its counterclaim that NP violated the antitrust laws by bringing suit against 3I, the court denied NP's motion for JMOL or, in the alternative, for a new trial under Fed.R.Civ.P. 50(b). In denying NP's motion, the district court held that the verdict was supported, inter alia, by the jury's factual findings that the patent was obtained through "NP's knowing fraud upon, or intentional misrepresentations to, the [PTO]" and that "NP maintained and enforced the patent with knowledge of the patent's fraudulent derivation" and with the intent of interfering directly with 3I's ability to compete in the relevant market. 930 F.Supp. at 1257. The court further held, based on these findings, that the jury need not have considered whether NP's suit was "objectively baseless." Id. at 1264.
 
 
 27
 In support of its position that the court erred in denying its renewed motion for JMOL, NP argues that there was a lack of substantial evidence to support the jury's finding that the patent was obtained through "fraud" and its finding that NP was aware of that conduct when it brought suit against 3I. NP also argues that these findings, even if supported by substantial evidence, do not provide a legal basis for the imposition of antitrust liability. Finally, NP argues that it is entitled to a new trial because the court failed to instruct the jury that bringing a lawsuit cannot be the basis for antitrust liability if that suit is not "objectively baseless."
 
 
 28
 3I responds that the jury's explicit findings that the patent was procured through fraudulent conduct and that NP knew of that conduct when it brought suit were supported by substantial evidence, and that these findings provide a sound basis for imposing antitrust liability on NP. Responding to NP's arguments for a new trial, 3I argues that an "objectively reasonable" or "objectively baseless" jury instruction was not necessary because the district court required that 3I prove that NP had actual knowledge of the inequitable conduct when it brought suit and that even if such an instruction was necessary, NP waived this argument by failing to propose a jury instruction relating to an "objectively baseless" standard.
 
 
 29
 We agree with NP that the court erred in denying its motion for JMOL; therefore we need not directly address the arguments concerning NP's motion for a new trial. We review a district court's denial of a post-trial motion for JMOL under Fed.R.Civ.P. 50(b) de novo by reapplying the standard applicable at the district court. Thus, this court
 
 
 30
 must determine whether there exists evidence of record upon which a jury might properly have returned a verdict in [the non-movant's] favor when the correct legal standard is applied. If there is not, [the movant] was entitled to have the question removed from the jury and decided as a matter of law.
 
 
 31
 Markman v. Westview Instruments, Inc., 52 F.3d 967, 975, 34 USPQ2d 1321, 1326 (Fed.Cir.1995) (in banc), aff'd, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577, 38 USPQ2d 1461 (1996) (quoting Jamesbury Corp. v. Litton Indus. Prods., Inc., 756 F.2d 1556, 1560, 225 USPQ 253, 257 (Fed.Cir.1985)); see also Deimer v. Cincinnati Sub-Zero Prods., Inc., 58 F.3d 341, 343 (7th Cir.1995); Shearing v. Iolab Corp., 975 F.2d 1541, 1544, 24 USPQ2d 1133, 1136 (Fed.Cir.1992) ("On appeal after denial of a motion for JNOV, the appellant must prove that the record lacks substantial evidence to support the jury's verdict."). In applying this standard, we must also "view the evidence in the light most favorable to the nonmoving party," which in this case is 3I. Deimer, 58 F.3d at 343.
 
 
 32
 When reviewing a district court's judgment involving federal antitrust law, we apply the law of the regional circuit in which that district court sits. See Loctite Corp. v. Ultraseal, 781 F.2d 861, 875, 228 USPQ 90, 99 (Fed.Cir.1985) ("We must approach a federal antitrust claim as would a court of appeal in the circuit of the district court whose judgment we review."). Accordingly, we would apply Seventh Circuit antitrust law were it clear. However, since the Seventh Circuit has not clarified the conditions under which a patentee may incur antitrust liability for enforcing its patent, we must also turn to Supreme Court precedent and to the law of the other regional circuits to determine how the Seventh Circuit would likely decide this issue.
 
 
 33
 A patentee who brings an infringement suit may be subject to antitrust liability for the anti-competitive effects of that suit if the alleged infringer (the antitrust plaintiff) proves (1) that the asserted patent was obtained through knowing and willful fraud within the meaning of Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 177, 86 S.Ct. 347, 350, 147 USPQ 404, 407 (1965), or (2) that the infringement suit was "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor," Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 144, 81 S.Ct. 523, 533, 5 L.Ed.2d 464 (1961); California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510, 92 S.Ct. 609, 611-12, 30 L.Ed.2d 642 (1972) (holding that Noerr "governs the approach of citizens or groups of them ... to courts, the third branch of Government"). See Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 61 n. 6, 113 S.Ct. 1920, 1929 n. 6, 123 L.Ed.2d 611 (1993) (PRE ) (declining to decide "whether and, if so, to what extent Noerr permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations").
 
 
 34
 In Walker Process, the Supreme Court held that in order "to strip [the patentee] of its exemption from the antitrust laws" when attempting to enforce its patent monopoly, an antitrust plaintiff is required to prove that the patentee "obtained the patent by knowingly and willfully misrepresenting facts[3] to the [PTO]." 382 U.S. at 177, 86 S.Ct. at 350, 147 USPQ at 407. The Court also cited two of its prior decisions which involved knowing and willful misrepresentation of facts to the Patent Office, which the Court described as "fraudulent procurement": Precision Instrument Manufacturing v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381, 65 USPQ 133, 138 (1945), and Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250, 61 USPQ 241 (1944).[4] In Precision Instrument, the patentee submitted false dates of conception and reduction to practice, and fabricated evidence in support of these dates, to ensure priority in an interference proceeding. Similarly, in Hartford-Empire, the patentee's attorney ensured that a patent would issue by falsely stating that an article he had authored praising the invention was actually written by a well-known expert in the field.
 
 
 35
 Justice Harlan, in a concurring opinion, emphasized that to "achiev[e] a suitable accommodation in this area between the differing policies of the patent and antitrust laws," a distinction must be maintained between patents procured by "deliberate fraud" and those rendered invalid or unenforceable for other reasons. Walker Process, 382 U.S. at 179-80, 86 S.Ct. at 351-52, 15 L.Ed.2d 247, 147 USPQ at 408. He then stated:
 
 
 36
 [T]o hold, as we do not, that private antitrust suits might also reach monopolies practiced under patents that for one reason or another may turn out to be voidable under one or more of the numerous technicalities attending the issuance of a patent, might well chill the disclosure of inventions through the obtaining of a patent because of fear of the vexations or punitive consequences of treble-damage suits. Hence, this private antitrust remedy should not be deemed available to reach [Sherman Act] § 2 monopolies carried on under a nonfraudulently procured patent.
 
 
 37
 Id. at 180, 86 S.Ct. at 351, 147 USPQ at 408.
 
 
 38
 The district court observed that the Supreme Court, in footnote six of its PRE opinion, "left unresolved the issue of how 'Noerr applies to the ex parte application process,' and in particular, how it applies to the Walker Process claim." 930 F.Supp. at 1253 (quoting James B. Kobak, Jr., Professional Real Estate Investors and the Future of Patent-Antitrust Litigation, 63 Antitrust L.J. 185, 186 (1994)). The court also accurately pointed out that we have twice declined to resolve this issue. See FilmTec Corp. v. Hydranautics, 67 F.3d 931, 939 n. 2, 36 USPQ2d 1410, 1415 n. 2 (Fed.Cir.1995), cert. denied, --- U.S. ----, 117 S.Ct. 62, 136 L.Ed.2d 24 (1996); Carroll Touch, Inc. v. Electro Mechanical Sys., Inc., 15 F.3d 1573, 1583 n. 10, 27 USPQ2d 1836, 1845 n. 10 (Fed.Cir.1993). Therefore, after reviewing three opinions from the Ninth and District of Columbia Circuit Courts of Appeals, see Hydranautics v. FilmTec Corp., 70 F.3d 533, 537-38, 36 USPQ2d 1773, 1777 (9th Cir.1995); Whelan v. Abell, 48 F.3d 1247, 1255 (D.C.Cir.1995); Liberty Lake Invs., Inc. v. Magnuson, 12 F.3d 155, 158-60 (9th Cir.1993), the district court made its own determination that PRE's two-part test for a sham is inapplicable to an antitrust claim based on the assertion of a patent obtained by knowing and willful fraud. 930 F.Supp. at 1253. We do not agree with that determination. PRE and Walker Process provide alternative legal grounds on which a patentee may be stripped of its immunity from the antitrust laws; both legal theories may be applied to the same conduct. Moreover, we need not find a way to merge these decisions. Each provides its own basis for depriving a patent owner of immunity from the antitrust laws. The Supreme Court saw no need to merge these separate lines of cases and neither do we.
 
 
 39
 If the elements for a finding of fraud within the meaning of Walker Process, as well as the other criteria for antitrust liability, are met, such liability can be imposed without an additional sham inquiry. Alternatively, when an antitrust claim is based on a PRE allegation that a suit is baseless, in order to prove that a suit is within Noerr's "sham" exception to immunity, an antitrust plaintiff must prove that the suit was both objectively baseless and subjectively motivated by a desire to impose collateral, anti-competitive injury rather to obtain a justifiable legal remedy. PRE, 508 U.S. at 60-61, 113 S.Ct. at 1928-29. As the Supreme Court stated:
 
 
 40
 First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and the antitrust claim premised on the sham exception must fail. Only if the challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under the second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor," through the "use [of] the governmental process-as opposed to the outcome of that process-as an anticompetitive weapon." ... Of course, even a plaintiff who defeats the defendant's claim to Noerr immunity by demonstrating both the objective and the subjective components of a sham must still prove a substantive antitrust violation. Proof of a sham merely deprives the defendant of immunity; it does not relieve the plaintiff of the obligation to establish all other elements of his claim.
 
 
 41
 Id. (footnotes and internal citations omitted). Thus, under PRE, a sham suit is one that is both objectively baseless and subjectively brought in bad faith. If a suit is not objectively baseless, an antitrust defendant's subjective motivation is immaterial. Id.
 
 
 42
 We conclude that 3I has proven no set of facts upon which a fact finder could strip NP of its immunity from antitrust liability. First, there exists no evidence to support the jury's finding that the "patent was obtained by fraud" within the meaning of a Walker Process counterclaim. Walker Process requires a showing that the patent was obtained through deliberate, affirmative misrepresentations, i.e., knowingly false statements, not mere omissions. See, e.g., Potters Med. Ctr. v. City Hospital Assoc., 800 F.2d 568, 581 (6th Cir.1986) (stating that "[o]nly known falsity supports an antitrust offense" and relying on an uncontested affidavit "which attested that [the antitrust defendant] knowingly made no false statements.") (emphasis added); Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240, 1261 (9th Cir.1982) (holding that under Walker Process "the fraudulent furnishing of false information to an agency in connection with the adjudicatory proceeding can be the basis for antitrust liability, if the requisite predatory intent is present and the other elements of an antitrust claim are proven.") (emphasis added); Kearney & Trecker, Corp. v. Giddings & Lewis, Inc., 452 F.2d 579, 594, 171 USPQ 650, 662 (7th Cir.1971) (characterizing the conduct at issue in Walker Process as "fraud involving the willful misrepresentation of facts to the Patent Office."); Bendix Corp. v. Balax, Inc., 421 F.2d 809, 819, 164 USPQ 485, 493 (7th Cir.1970) ("Thus, to prevail here, defendants must prove ... that any misstatements by plaintiff in its patent applications were the product of intentional fraud and not good faith mistake.") (emphasis added). The jury's verdict was based in part on its finding of "fraud," but there exists no evidence of any affirmative misrepresentation that would constitute such fraud. Pursuant to then-existing PTO regulations, Branemark was required to aver, inter alia, that "the invention has not been ... described in any printed publication in any country before his invention or more than one year prior to his application." 37 C.F.R. § 1.65 (1990). The evidence does not support a finding that this statement, or any other statement to the PTO made by or attributable to Branemark, was knowingly false. For, even if we accept 3I's and the dissent's unsupported assertion that Barnieske knew that the 1977 Book was material, knowledge that a reference is material is not the same as knowledge that a reference describes an invention and hence renders it unpatentable.
 
 
 43
 While there may have been substantial evidence to support a finding of inequitable conduct consisting of withholding the 1977 Book with the intent to deceive the PTO,[5] under Walker Process such evidence will not support antitrust liability. As we have previously stated, inequitable conduct that will render a patent unenforceable is a broader, more inclusive concept than the "fraud" needed to support a Walker Process counterclaim. See, e.g., Hewlett-Packard Co. v. Bausch & Lomb Inc., 882 F.2d 1556, 1563, 11 USPQ2d 1750, 1756 (Fed.Cir.1989); FMC Corp. v. Manitowoc Co., 835 F.2d 1411, 1417-18, 5 USPQ2d 1112, 1117 (Fed.Cir.1987); Argus Chem. Corp. v. Fibre Glass-Evercoat Co., 812 F.2d 1381, 1384-85, 1 USPQ2d 1971, 1973-74 (Fed.Cir.1987); J.P. Stevens & Co. v. Lex Tex Ltd., 747 F.2d 1553, 1559, 223 USPQ 1089, 1092 (Fed.Cir.1984) ("Conduct before the PTO that may render a patent unenforceable is broader than common law fraud."). Thus, inequitable conduct can include both an intentional failure to disclose material prior art as well as an intentional misrepresentation. See 37 C.F.R. § 1.56 (1996) ("Duty to disclose information material to patentability"); see also Kingsdown Med. Consultants Ltd. v. Hollister Inc., 863 F.2d 867, 872, 9 USPQ2d 1384, 1389 (Fed.Cir.1988). However, as noted above, only affirmative misrepresentations come within the definition of Walker Process fraud. See Potters Med. Ctr., 800 F.2d at 581; see also Argus Chem. Corp., 812 F.2d at 1384-85, 1 USPQ2d at 1973-74 (stating that " 'knowing and willful fraud,' as the term is used in Walker, can mean no less than clear, convincing proof of intentional fraud involving affirmative dishonesty") (quoting Cataphote Corp. v. DeSoto Chem. Coatings, Inc., 450 F.2d 769, 772, 171 USPQ 736, 738 (9th Cir.1971)); Bendix Corp., 421 F.2d at 819, 164 USPQ at 493. The Supreme Court in Walker Process was quite explicit in premising antitrust liability on knowing and willful misrepresentations, but not on other types of misconduct that might render a patent unenforceable such as the failure to disclose material prior art. The Court expressly discussed only knowing and willful misrepresentations, contrasted with good faith or honest mistakes, or mere "technical" fraud; it did not deal with inequitable conduct involving even a knowing failure to disclose a material reference. Accordingly, the inventors' failure to disclose the 1977 Book, even if that failure was known by NP, cannot support the imposition of antitrust liability on NP based on Walker Process fraud.
 
 
 44
 The dissent asserts that a finding of antitrust liability under Walker Process may be premised on an omission coupled with a duty of disclosure. We disagree. It is of course true that an applicant for a patent owes a duty of candor to the PTO, see 37 C.F.R. § 1.56 (1996), and that breach of a duty can constitute common law fraud. However, Walker Process and its progeny, which are applicable to a broad array of administrative contexts, see, e.g., Clipper Exxpress, 690 F.2d at 1260-61 (extending Walker Process doctrine "to cases not arising in a patent context"), draw a line between omissions and affirmative misrepresentations. We choose not to breach that line. Allegations of inequitable conduct are a staple these days in pleadings attacking patents or defending against charges of patent infringement. Alleged failure to disclose prior art, whether or not material or intentional, is the basis for many of these charges. Were we to hold that failure to cite prior art provides a basis for Walker Process antitrust liability, most patent infringement actions would be converted into antitrust cases, the shield of inequitable conduct into the sword of antitrust liability. See Korody-Colyer Corp. v. General Motors Corp., 828 F.2d 1572, 1578, 4 USPQ2d 1203, 1207 (Fed.Cir.1987). We do not believe that the Supreme Court intended Walker Process to effect that result. Failure to cite prior art is not Walker Process fraud.
 
 
 45
 The evidence also indicates that NP's suit could not be found to be objectively baseless and therefore was not a sham. The jury's finding that NP knew that the patent was either invalid or unenforceable when it brought suit is insufficient to support antitrust liability. The evidence, especially Dr. Green's testimony that he was told that "if the Patent Office did not receive a copy of [the 1977 Book], and if that were true, then we would have a larger problem and that was fraud," may support a conclusion that NP subjectively believed that the suit would be baseless or brought the suit in bad faith. However, the evidence would not support a jury verdict that such a suit was objectively baseless. See Creek v. Village of Westhaven, 80 F.3d 186, 192 (7th Cir.1996) (citing PRE for the proposition that "[s]uits that are objectively baseless, that is, frivolous suits, as distinct from colorable suits brought in bad faith, are not constitutionally protected.").
 
 
 46
 The conduct in question was a failure to cite possibly relevant prior art, which relates to inequitable conduct. A conclusion of inequitable conduct requires an equitable weighing by the court of the factual issues of intent to deceive and materiality of alleged omissions or misrepresentations in view of the totality of circumstances. See Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178-79, 33 USPQ2d 1823, 1826-27 (Fed.Cir.1995); Akzo N.V. v. United States Int'l Trade Comm'n, 808 F.2d 1471, 1481-82, 1 USPQ2d 1241, 1247 (Fed.Cir.1986). Thus, by its very nature, a court's ultimate conclusion of inequitable conduct is not predictable. Therefore, an omission that might later be found to constitute inequitable conduct, such as the failure to disclose the 1977 Book in this case, cannot as a matter of law be the basis for finding that an infringement suit was objectively baseless.
 
 
 47
 Furthermore, contrary to the dissent's assertion, the 1977 Book did not "essentially describe and illustrate the invention." Rather its disclosure of micropits having the claimed diameter and spacing was not explicit and was only made apparent after 3I, during litigation, measured highly enlarged copies of the SEMs depicted in the 1977 Book. Based on this limited disclosure, NP raised bona fide arguments that the 1977 Book did not render the patent invalid and that the failure to disclose the 1977 Book did not render the patent unenforceable. Thus, NP could have had an objectively reasonable expectation that it could prevail on the merits. Also, significantly, NP had asserted the '891 patent against two other parties, and apparently overcame motions for summary judgment of invalidity and unenforceability in those suits. Cf. PRE, 508 U.S. at 64-65, 113 S.Ct. at 1930-31 ("Even though it did not survive PRE's motion for summary judgment, Columbia's copyright action was arguably 'warranted by existing law' or at the very least was based on an objective 'good faith argument for the extension, modification, or reversal of existing law.' Fed. Rule Civ. Proc. 11."). These facts belie a conclusion that a reasonable litigant in NP's position would have known that the patent would inevitably be held invalid or unenforceable. As this court and others have cautioned, a patentee must be allowed to test the validity or enforceability of its patent, even if it fears that the patent may be invalid or unenforceable. See Loctite Corp. v. Ultraseal Ltd., 781 F.2d 861, 876-77, 228 USPQ 90, 101 (Fed.Cir.1985) (noting "the public policy of erecting a barrier against thwarting patentees from asserting legitimate patent rights"); Handgards, Inc. v. Ethicon, Inc., 601 F.2d 986, 993, 202 USPQ 342, 348 (9th Cir.1979) ("Patentees must be permitted to test the validity of their patents in court through actions against alleged infringers."). The imposition of antitrust liability on NP in this case would thwart its entitlement to test the validity and scope of its patent.
 
 
 48
 As the Supreme Court admonished in PRE, "a court must 'resist the understandable temptation to engage in post hoc reasoning by concluding' that an ultimately unsuccessful 'action must have been unreasonable or without foundation.' " 508 U.S. at 61 n. 5, 113 S.Ct. at 1928 n. 5 (citing Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 422, 98 S.Ct. 694, 701, 54 L.Ed.2d 648 (1978) ("Even when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.")). The dissent has fallen prey to this "understandable temptation." NP may have lost its suit, but the record indicates that a "similarly situated reasonable litigant could have perceived some likelihood of success." PRE, 508 at 62-65, 113 S.Ct. at 1929-31. That is all that is needed to provide Noerr immunity. See PRE, 508 U.S. at 60, 113 S.Ct. at 1928 (stating that to support antitrust liability, a suit must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits [or] could conclude that the suit is reasonably calculated to elicit a favorable outcome."); id. at 69, 113 S.Ct. at 1932-33 (Stevens & O'Connor, JJ., concurring) (stating that no antitrust liability should arise from a suit in which the plaintiffs "invoked the federal court's jurisdiction to determine whether they could lawfully restrain competition from competitors"). Accordingly, because NP's suit was reasonably calculated to elicit a favorable outcome, not merely to impose collateral harm on 3I, the suit was not a sham and was thus entitled to Noerr immunity.
 
 
 49
 Because the evidence cannot support a verdict that the patent was obtained by Walker Process fraud, or that NP's infringement suit was objectively baseless, we reverse the district court's decision denying NP's motion for JMOL on 3I's antitrust counterclaim and instruct the court to grant the motion.
 
 CONCLUSION
 
 50
 The district court did not err in holding the '891 patent invalid as a matter of law at the close of NP's case-in-chief because NP itself introduced evidence that was fatal to the patent's validity. However, the district court erred in denying NP's motion for JMOL on 3I's antitrust counterclaim. No reasonable jury, applying the correct law, could have found that the facts were sufficient to strip NP of its antitrust immunity. The evidence of record does not support a conclusion that the '891 patent was obtained by fraud within the meaning of Walker Process or that NP's suit was objectively baseless.
 
 COSTS
 
 51
 No costs.
 
 
 52
 AFFIRMED-IN-PART and REVERSED-IN-PART.
 
 
 53
 PLAGER, Circuit Judge, concurring-in-part and dissenting-in-part.
 
 
 54
 I respectfully dissent from the majority's effort to immunize patent law from the standards for antitrust liability established by the Supreme Court. There is no warrant in law for the new rule announced by the panel, and it is bad public policy. Antitrust liability exposure, carefully cabined as it is by Supreme Court doctrine, is no more onerous for patent plaintiffs than it is for other plaintiffs. To hold, as the majority does, that on the egregious facts of this case the plaintiff's scheme to perpetrate a fraud on the U.S. Patent and Trademark Office ("PTO") and on the courts does not reach the threshold needed for antitrust liability is in effect to hold that, in patent law, anything goes. I cannot subscribe to that conclusion.
 
 
 55
 I join the opinion of the majority in Part A, holding that the trial court did not err in finding the '891 patent invalid as a matter of law. With regard to the antitrust counterclaim discussed in Part B, I join the majority's determination that Walker Process and Professional Real Estate Investors ("PRE ") provide independent bases on which patent owners who utilize the courts to enforce their patent rights may, in appropriate cases, be stripped of their immunity from antitrust law. I must, however, respectfully dissent from the majority's conclusion in part B that, based on a heretofore unknown legal hurdle, no reasonable jury could have found NP liable for its conduct.
 
 
 56
 One of the inventors of the invention that was later sought to be patented published a 1977 Swedish textbook in which he essentially described and illustrated the invention. (The stated facts and factual conclusions are from the record on appeal, and in the case of disputed facts are those established by the findings of the judge and jury. The majority's attempt to reargue the facts on NP's behalf--see slip op. at 1474-1475 is little more than an appellate court's assertion that it is better at fact finding than the trial judge and jury.) Years later, when his co-inventor prepared a draft of the initial application for a Swedish patent, the co-inventor included the textbook as a prior art reference.
 
 
 57
 The patent attorney employed to handle the prosecution of the Swedish patent deleted the book references from the Swedish application. Later, the same attorney sent the incomplete Swedish filing to the U.S. patent attorneys who were to prosecute the U.S. application, and told them that he was "not aware of any prior art which is not mentioned in the application as filed." At the time, the Swedish attorney, experienced in U.S. patent law, recognized that the inclusion of that material reference was statutorily required, that including the 1977 book would result in a denial of the application, and that any patent issued would be invalid. See 35 U.S.C. § 102(b) (1994) ("A person shall be entitled to a patent unless ... the invention was ... described in a printed publication in this or a foreign country ... more than one year prior to the date of the application....").
 
 
 58
 Although the record before us does not indicate it, presumably the inventors signed the fraudulently prepared application. As the majority opinion acknowledges, at the time 37 C.F.R. § 1.65 required an applicant to aver, inter alia, that "the invention has not been ... described in any printed publication in any country before his invention or more than one year prior to his application." See also 37 C.F.R. § 1.56 (1997) (imposing a duty to disclose information material to patentability upon anyone associated with the filing and prosecution of a patent application). The application was submitted to the PTO, and in due course the patent issued.
 
 
 59
 The patent was assigned to plaintiff NP. One of the co-inventors was a senior executive in NP. He and other officers of the company knew of the existence and non-disclosure of the 1977 book. When discussions were held about enforcing the patent, they were advised by company counsel that the patent was invalid and should not be used in litigation. Despite their knowledge, and in the face of that counsel, they proceeded to invoke the patent, and apparently were successful in two prior actions for patent infringement. Thinking they were safe in their scheme to defraud, they invoked it once again against defendant 3I. The majority does not dispute the trial court's conclusion that the actions of the inventors, the patent attorney, and the officers of NP are attributable as a matter of law to NP.
 
 
 60
 Unfortunately for plaintiff, 3I uncovered the fraud. As the majority itself describes it, albeit reluctantly, "there may have been substantial evidence to support a finding of ... withholding the 1977 Book with the intent to deceive the PTO." Slip op. at 1473. The trial court submitted defendant's counterclaim for antitrust damages to a jury. After a full trial, the jury found, in response to specific interrogatories, that plaintiff had engaged in a course of conduct that constituted fraud, thus stripping plaintiff of the antitrust immunity otherwise applicable to those who seek redress in the government's courts. This factual finding by the jury was affirmed by the trial judge in his denial of NP's JMOL and motion for a new trial on 3I's antitrust counterclaim, and is supported not simply by substantial evidence but by overwhelming proof in the record (which the majority does not deny). Despite this, and despite the majority's own recognition of the egregiousness of NP's conduct, the majority overturns the jury verdict on the grounds that this course of action constitutes a "mere omission," and does not meet the requirements of either Walker Process or PRE.
 
 
 61
 I find this difficult to understand, and inconsistent with what is widely understood to constitute misrepresentation and fraud. If a federal official investigating undue influence and corruption by A were to ask a third-party witness, "With whom did you have dinner on the night in question," and that person answered "With B and C," when in fact the truth was that A was also there, would that be considered a "mere omission" for which no liability could attach?[1] See United States v. Mattox, 689 F.2d 531 (5th Cir.1982) (affirming defendant's conviction under 18 U.S.C. § 1001 for making false statements when he had relevant information but put "N/A" or left blank some responses on a government form).
 
 
 62
 We need not decide whether the attorney for the inventors in this case may have committed a criminal offense under § 1001. It is enough to see that submitting a list of prior art references pursuant to PTO regulations while knowingly and intentionally withholding a reference which, but for the fraudulent concealment, would in all probability defeat the application for patent, constitutes deliberate fraud on the PTO. Even worse, to later invoke the patent in infringement litigation, knowing that it was most likely invalid, without disclosing the known facts to the court, is to perpetrate a fraud on the court.
 
 
 63
 The majority attempts to bolster its position by selectively quoting from the Supreme Court's opinion in Walker Process. This was the case that first dealt with loss by a patentee of antitrust immunity as a result of fraudulently obtaining a patent.[2] The majority reads the Supreme Court's language as requiring that the patent be obtained by deliberate, affirmative misrepresentations, not "mere omissions." But the majority's quote leaves out the part in which the Court goes on to distinguish between intentional fraud, the issue in the case before it, and "technical fraud," the latter resulting from acts in good faith involving honest mistakes. Walker Process, 382 U.S. at 176-77, 86 S.Ct. at 349-50.
 
 
 64
 The majority opinion's definition of fraud seems to draw a distinction between the witness who testifies that "A was not there" and one who testifies "only B and C were there." The former would be an "affirmative misrepresentation" whereas the latter would be only a "mere omission." Nothing in Walker Process suggests such a distinction, and to find it in the language of Walker Process requires a crabbed reading indeed. Furthermore, such a purely verbal requirement ignores the fact that an intentional non-disclosure is both affirmative and a misrepresentation--a suppression of the truth.
 
 
 65
 The majority mischaracterizes my position as "premised on an omission coupled with a duty of disclosure." Slip op. at 1474. Regrettably, that reflects a lack of understanding of the point. What occurred here was not a "mere omission," as the majority would have it, but an affirmative act of deliberate misrepresentation. The majority would rewrite the facts to make this an innocent oversight. The judge and jury found the facts otherwise. Indeed, as the trial judge, after reviewing the facts in evidence in this case, stated in his opinion, "there was a sense of fraud in the air, which sense the jury later confirmed."
 
 
 66
 In my view, NP's actions define "knowing and willful fraud." Their agent, by whose actions they are bound, affirmatively misrepresented the state of the prior art to the PTO; they continued the fraud by intentionally enforcing in court a patent which they had every reason to believe was invalid. Overall, NP's actions smack of a "deliberately planned and carefully executed scheme to defraud" both the PTO and the court. Argus Chem. Corp. v. Fibre Glass-Evercoat Co., 812 F.2d 1381 (Fed.Cir.1987) (quoting Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 245, 64 S.Ct. 997, 1000-01, 88 L.Ed. 1250 (1944)). To hold, as the majority does, that such a course of conduct is, as a matter of law, an insufficient basis for the jury's finding of fraud is to grant to patentees carte blanche in their conduct in prosecuting and enforcing patents.
 
 
 67
 The majority candidly admits that its concern is not with the particular facts of this case, but with the fear that, in the future, every time a patent is held unenforceable because of a failure by the applicant to cite a piece of material prior art, there will ensue a round of antitrust counterclaims and damage awards. ("Were we to hold that failure to cite prior art provides a basis for Walker Process antitrust liability, most patent infringement actions would be converted into antitrust cases." Slip op. at 1473.) This is a classic "parading of the horribles," and is purely speculative.
 
 
 68
 The position is also without foundation. The fact that the actions by NP could constitute inequitable conduct, an independent ground on which the patent might be held unenforceable, is of course not relevant and of no significance regarding the issue before us. To find inequitable conduct, a court exercising its equitable powers must balance materiality and intent, see Critikon, Inc. v. Becton Dickinson Vascular Access, Inc., 120 F.3d 1253, 1256 (Fed.Cir.1997), and ultimately decide whether, in light of the applicant's conduct before the PTO, it would be inequitable to allow the patentee to enforce its patent rights. In contrast, for the purpose of determining whether a patentee is liable under the antitrust laws, a court must first find the predicate conditions for antitrust liability under the Sherman Act, including both possession of monopoly power (defined as the power to control prices or exclude competition) in the relevant market, and anticompetitive conduct to acquire or maintain such power. See 1 ABA Section of Antitrust Law, Antitrust Law Developments 229-51 (4th ed.1997). (The existence of those predicates is not contested in this appeal.)
 
 
 69
 Assuming the predicates for antitrust liability are found to exist, the question may then arise whether the antitrust defendant is immune from liability under the Noerr-Pennington doctrine, or whether such immunity has been lost under the terms of either Walker Process or PRE. Under Walker Process, the focus is on whether particular acts by the applicant/patentee, in the procurement and enforcement of a patent, constitute knowing fraud; no balancing of materiality and intent is required as it is in inequitable conduct. And of course, in inequitable conduct no predicate conditions, such as those in antitrust law, are necessary for a finding of liability.
 
 
 70
 In this case, the jury found that NP's acts, viewed cumulatively, constituted fraud. This is not a case in which the appellants acted with good faith or even with gross negligence. NP's agent deliberately omitted an anticipating reference, then NP knowingly enforced its fraudulently procured patent. Such conduct is more than sufficient to strip NP of antitrust immunity under Walker Process.
 
 
 71
 With regard to the alternative basis for loss of immunity as set forth in PRE, it is not at all clear that that issue was properly preserved. Nevertheless, since the majority saw fit to discuss it, I will comment briefly. The majority concludes that the lawsuit in this case was not objectively baseless. They reach this conclusion on two grounds. First, the majority observes that both the antitrust issue and the doctrine of inequitable conduct involve "fraud" in the application process before the PTO. Since in order to determine "fraud" in the inequitable conduct cases there is a balancing of intent and materiality, the outcome in the antitrust cases cannot be known until a court decides how that balance is to be struck--that is whether there was inequitable conduct. The trial court in this case, having found the patent invalid, mooted the inequitable conduct issue; thus, it is not known whether the court would have found inequitable conduct on these facts. That being the case, it cannot be known whether there was fraud for antitrust purposes.
 
 
 72
 Of course, that analysis simply confuses two different meanings of the term "fraud." The majority's analysis blends enforcement of an invalid patent, the case here, with "fraud" as found in inequitable conduct cases, an issue not before us. There no doubt will be any number of situations in which inequitable conduct may be found to exist, the court having struck the proper balance, but in which the facts would not constitute the type of fraud that would lead to antitrust liability. In the one case, the question is simply whether the conduct of the applicant who sought the patent makes it inequitable to enforce the patent against the alleged infringer. In the other case, the question involves whether the patentee is engaged in monopolistic activity, a separate inquiry; whether the patentee is using the patent in furtherance of that activity; and whether the patentee knew of the fraud in the procurement of the patent. These are distinct and different issues, as illustrated by the fact that one is entirely a matter for a judge to decide, whereas the other, being fact specific, is typically a jury question.
 
 
 73
 This distinction was articulated in a Federal Circuit opinion a decade ago. There it was pointed out that our cases reflect three standards for judging the misconduct by a patentee, dependent upon the nature of the relief which the opposing litigant seeks: (1) misconduct which makes a patent unenforceable ("inequitable conduct"); (2) misconduct which makes a case "exceptional" so as to warrant an award of attorney fees (see 35 U.S.C. § 285 (1994)); and (3) misconduct which rises to the level of fraud and which will support an antitrust claim. See Argus Chem. Corp. v. Fibre Glass-Evercoat Co., Inc., 812 F.2d 1381, 1386 (Fed.Cir.1987) (Nies, J., additional views). The majority's apparent assumption that these standards are, or will necessarily become, confused, resulting in a torrent of unjustified antitrust claims against innocent patentees, is ill-founded. If nothing else, it gives trial courts less credit than they deserve for being able to recognize when a defendant frivolously cries antitrust.
 
 
 74
 The second ground which the majority finds persuasive in establishing that the lawsuit is not baseless is that NP succeeded in two prior lawsuits, and thus might reasonably have expected to get away with it again. That of course simply awards wrongdoers who are lucky or clever enough to get away with their wrongdoing. Successful wrongdoing cannot provide grounds upon which a "reasonable litigant could realistically expect success on the merits." PRE, 508 U.S. at 60, 113 S.Ct. at 1928. What NP knew about the history of the '891 patent, and with their own lawyer's advice before them, makes clear that they knew that their lawsuit was baseless; no reasonable litigant could have thought otherwise. PRE preserves a litigant's right to test the reach of the law, or even to seek an extension of established law; it does not protect knowing, but as yet undiscovered, fraud. See PRE, 508 U.S. at 64-65, 113 S.Ct. at 1930-31 ("Columbia's copyright action was arguably 'warranted by existing law' or at the very least was based on an objectively 'good faith argument for the extension, modification, or reversal of existing law.' " (quoting Fed.R.Civ.P. 11)). Once it is concluded that the lawsuit was objectively baseless, the first step in a PRE analysis, the second step, determining the litigant's subjective motivation, would provide no hurdle in this case.
 
 
 75
 There is no basis in law for this court to overturn the jury's verdict in favor of 3I, and every reason both in law and policy not to. I would affirm the district court's judgment denying NP's motion for JMOL on 3I's antitrust counterclaim, and thus I must respectfully dissent from the majority judgment to the contrary.
 
 
 
 [1]
 The district court indicated that Branemark and af Ekenstam assigned the '891 patent to NP prior to NP's bringing this suit. 3I has not challenged NP's standing to bring this patent infringement claim without joining Branemark and af Ekenstam
 
 
 [2]
 NP suggests that it introduced the portions counter-designated "as a matter of convenience and efficiency" during its own case-in-chief. At oral argument, NP also suggested that it introduced these portions "as a courtesy" to 3I. While such motives are commendable, they do not change the significance and meaning of this evidence
 
 
 [3]
 The alleged misrepresentation involved the patentee's sworn statement "that it neither knew nor believed that its invention had been in public use in the United States more than one year prior to filing its patent application when, in fact, [it] was a party to prior use within such time." Walker Process, 382 U.S. at 174, 86 S.Ct. at 348, 147 USPQ 404, 406; cf. 35 U.S.C § 115 (1994); 37 C.F.R. § 1.63 (1996) (The PTO does not currently require inventors to file a sworn statement regarding such knowledge or belief.)
 
 
 [4]
 The Court also cited Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933), which involved an agreement to suppress evidence in the course of litigation. However, in that case, the court invoked only the equitable doctrine of "unclean hands" to prevent the patentee from enforcing the patents at issue
 
 
 [5]
 As noted above, the district court did not hold the patent unenforceable due to inequitable conduct. It declined to consider inequitable conduct because it concluded that its judgment of invalidity rendered the issue moot. Because neither party raises the issue on appeal, we address it only to the extent that it is necessary to our analysis of 3I's antitrust counterclaim
 
 
 [1]
 See 18 U.S.C. § 1001 (1994), providing in relevant part:
 [W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully--1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; 2) makes any materially false, fictitious, or fraudulent statement or representation; ... shall be fined under this title or imprisoned not more than 5 years, or both.
 
 
 [2]
 Walker Process arose in the context of an intentional misrepresentation before the PTO. The principle of the case--supplying fraudulent information to an administrative agency, thus threatening the fair and impartial functioning of the agency--has been extended to other agencies. See, e.g., Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240, 1261-62 (9th Cir.1982)